[Crim. No. 9235. In Bank. Mar. 6, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. NATHAN ELMONT ELI, Defendant and Appellant.

Nathan Elmont Eli, in pro. per., and Daniel B. Hunter, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment, after trial before a jury, on verdicts finding defendant guilty of murder in the first degree and imposing the death penalty.

*Facts:* In February 1965 Donald Dunn, a lieutenant in the United States Navy, lived at 5138 Manchester Road in San Diego. On February 6 or 7, 1965, the ship to which he was assigned left San Diego on maneuvers. It was anticipated the ship would return approximately the first of March.

Lt. Dunn's wife was 4 feet 11 inches tall and weighed 104 pounds. Mr. Anthony Daniels, a neighbor, saw her in her backyard between 4 and 5 p.m. on Saturday, February 20, 1965. Normally a light was on in the back of the Dunn house in the evening, but Mr. Daniels saw no light there on Sunday.

George Harvey James is the San Diego distributor for the Kirby Company, which conducts a business of selling vacuum cleaners in homes. In February 1965 defendant was working for Mr. James as a salesman for the company. At that time defendant was almost 21 years old.

An appointment had been made to demonstrate a vacuum cleaner to Mrs. Dunn on Friday, February 19, 1965. The appointment was rescheduled for 7 p.m. on Saturday, the 20th, and defendant was assigned to make the call.

Men who work for the company are trained in the procedures to be used in making demonstrations. After demonstrating the machine, the salesman makes a "trial close." If this is unsuccessful, further demonstration is made, and the salesman again asks for an order.

If this is not successful, further demonstration is made, and the salesman telephones the office in an attempt to arrange a lower down payment or lower payments. This latter conversation is the final step and is recorded on the company's form. No such call was made by defendant from the Dunn residence.

On February 22, 1965, Officer Edward T. Young received a call to go to 5138 Manchester Road in San Diego. He arrived at approximately 1:55 p.m. As he entered, he saw a small boy, three or four years old, and a dog. He went down the hallway leading off the living room, and on the bed in one of the

bedrooms he saw the partially nude body of Mrs. Dunn. She had obviously been dead for some time. In the bedroom across the hall from the room where the body was, Officer Young discovered a baby about six months old, lying in a crib. He wrapped the baby in a blanket and took it to the neighbors across the street.

Sergeant Edward C. Stevens arrived at 5138 Manchester Road around 3 p.m. and made an examination of the house and its interior. In the bedroom he saw Mrs. Dunn's body. She was wearing a blue sleeveless blouse or sweater and a brassiere, and was otherwise nude. There was a small blood fleck on her right eyelid. Bloody foam exuded from her nose, and blood was running down the left side of her face onto the bed. There was a brown, two-strand cord wrapped around her neck several times and knotted under her right ear in what appeared to be a square knot.

In her left chest there were what appeared to be two puncture wounds, close together. There was blood running from these wounds down the left side of her body and soaking into the mattress. On the floor between the bed and the dresser there were a pair of red capri pants, a pair of white ladies' panties, and a pair of black ladies' low slippers. Between the bed and the wall there was a table lamp. The cord was pulled loose at the base of this lamp. Defendant's fingerprints were found in the apartment.

An autopsy of Mrs. Dunn's body disclosed a stab wound in the left lung and a small residuum of the stab wound on the back of the chest. Death was caused by (1) bleeding into the chest and collapse of the left lung because of the stab wound and (2) ligature strangulation.

About 1 a.m. on February 25, 1965, defendant's father telephoned the police, advising them that defendant wanted to come in and talk with them about the case. An appointment was made for 9 or 9:30 a.m. Defendant appeared at the police station, as scheduled, accompanied by his parents.

Sergeant Stevens told Officer Wright to take defendant to the back of the office and said that they would interview him there. Sergeant Stevens then told defendant that he did not have to make any statement, that any statements he made could be used in court, and that he was entitled to an attorney. When asked if he understood, defendant answered, "Yes."

Defendant was asked when he first became aware of the Dunn case. He said that on Wednesday night, while he and

his family were returning from a trip to Ventura, there was a news broadcast that made reference to the Eva Croft murder and also to the Dunn case; that the name "Dunn" rang a bell with him, and when he returned home, he checked his appointment cards and found he had had an appointment at the Dunn home; and that he told his father about it, and his father called the police department and set up an appointment to bring him to the station.

Defendant told the officers that he arrived at the Dunn house on February 20, 1965, about 7 p.m. or shortly thereafter, parked his car, brought the vacuum cleaner equipment into the house, gave Mrs. Dunn 250 Blue Chip stamps, made a telephone call back to his office, and then began the demonstration.

He said that he started with the Handi-Butler, which has a knife sharpener attachment, and asked Mrs. Dunn - if she wanted to have any knives sharpened; that she produced a knife with a serrated edge, but he was not sure whether he sharpened the knife or not; that he cleaned the oven and polished a silver candlestick; and that he then brought out the crystalator attachment used for demothing closets and during this demonstration built a foam snowman in the bathtub for the little boy.

Defendant further stated that he and Mrs. Dunn went into the bedroom; that he vacuumed the mattress, showing her the dead skin which had been removed; that she remade the bed with clean sheets; that they then talked about the sale of the machine, and Mrs. Dunn gave him what defendant termed the "husband objection"; that he was not able to overcome it; and that he therefore packed up his machine and left about 9 p.m., arriving home about 9 :30.

Defendant told the officers that when he arrived home, he watched TV with his mother, that his father came home from work around 10 :15 or 10 :30, and that they watched the news on TV, ate, and then went to bed.

He further said that he drove a 1955 Mercury with a blue top and a white bottom; that at the time of his visit to the Dunn house he was wearing a green suit with a white shirt and a tie; that on Sunday and Monday he had visited with his girl friend; and that on Tuesday his car "blew a rod" and he had taken the car to the "E" Street Auto Wreckers.

When asked if the officers could examine the clothing he was wearing Saturday night and his car, defendant said they

could. Defendant, Sergeant Stevens, and Officer Wright then left the police station in a police car and drove to defendant's house. Defendant went into his bedroom and brought out a green suit and a white shirt, which Sergeant Stevens put in the back seat of the police car.

Afterwards, the officers and defendant went to the "E" Street Auto Wreckers in Chula Vista, and defendant showed the officers his car. Defendant talked with the mechanic, who was taking the old motor out of the car and putting another motor in.

They returned to the police car, and defendant said that he was not sure which pair of shoes he had been wearing Saturday night and that they might be a pair he had at home. Defendant was asked if it would be all right if they went back to his home and picked up the pair of shoes, and he answered that it would. They returned to defendant's home, and defendant gave the officers the pair of shoes. They then returned to the police station.

After further discussion of the facts of the case, they had lunch. When asked, defendant readily agreed to a lie detector test. He was then taken to room 33 and introduced to Mr. Gardella, the polygraph examiner for the police department, about 2:05 p.m. Mr. Gardella explained the test and told defendant that he had to volunteer for the test, that anything he said could be used against him at a trial, and that he had the right to counsel. Defendant signed a statement consenting to the interview.

After the test was given, Mr. Gardella told defendant that, in his opinion, defendant was not telling the truth; that the test showed he had had sexual relations with Mrs. Dunn; and that there was deception on other critical questions.

Defendant then said that Mrs. Dunn had started making double meaning statements, which led him to believe she wanted to have sexual relations; that he had asked her if that is what she meant; that she said it was and went into the bedroom, undressing as she went; that he had a very short act with her and then left; and that the last he saw of Mrs. Dunn was while she was standing, alive and well, at the front door.

Defendant was told that the evidence did not substantiate his story and that he was lying. He was told that there was evidence which would indicate the intercourse had taken place after Mrs. Dunn's death. He said he did not care what the evidence showed, that he knew what had happened, and that

he did not have anything to worry about, as he had not murdered Mrs. Dunn.

At defendant's suggestion, he was reexamined with questions he had written himself; but he was told that the results still showed deception and that in Mr. Gardella's opinion he had taken Mrs. Dunn's life.

Sergeant Stevens then left the room, and defendant asked Officer Wright: "If you had a situation where a person attacked another person with a weapon and the person became injured, and then, through anger or whatever, the person attacked went further, would the evidence show this?"

Officer Wright said that it might and then said: "Following through with this hypothetical situation, let's say the person attacked through anger or whatever, wrapped a lamp cord around this person's neck. Is that what happened in this case?"

At this time Mr. Gardella said, "Is that how it happened? Tell us about it." Defendant, who was about 5 feet 7 inches tall, weighed 155 or 160 pounds, and had taken a basic course in self-defense (karate) in Japan, answered: ". . . That's how it happened. What I told you before was the truth. After I laid her I went out to the front room to pack up. She came out and started getting on me. She got mad and went over to the fireplace and grabbed the knife and came at me. I grabbed her and threw her in a counter throw. She went down. I think the knife hit her twice, but on the way down the knife went in. She didn't make a sound. She just changed. I was mad or scared. All mixed up. I picked her up and carried her into the bed. I jerked the cord from the lamp and wrapped it around her neck. I don't care what the evidence or anything else shows. I feel I was in defense of my life when I killed the woman. I didn't murder her."

Mr. Gardella left the room to summon Sergeant Stevens. Defendant asked if they could really tell when sexual intercourse occurred, and Officer Wright answered that he had not talked to the laboratory people and did not know what they had found.

When asked if he had been at the house, Officer Wright said that he had. Defendant inquired, "You didn't find any blood in the front room, did you?" Officer Wright said that he did not find any and that none was there as far as he knew. Defendant said that they could not have found blood in that room, as Mrs. Dunn had landed on her back.

When Sergeant Stevens returned, defendant repeated his statements. A police department stenographer was then called, and defendant was interrogated before her, with a record of the questions and his answers being made.

At the commencement of the interrogation, defendant was reminded that he had been advised of his constitutional rights prior to being questioned that morning, and he was told he was being given the same admonishment at that time. Defendant was asked if he understood, and he replied in the affirmative.

In the course of describing the demonstration he had made to Mrs. Dunn, defendant said that when he had offered to sharpen a knife, Mrs. Dunn had brought out two knives; that one of them was "perforated," and he could not sharpen it; that he did not sharpen the other one, because it was not in need of sharpening; and that it was placed on the mantle above the fireplace.

After reiterating his previous statement that Mrs. Dunn had sought to initiate sexual intercourse, he said that after intercourse had taken place and he had returned to the living room and was preparing to leave, she humiliated him by saying that she did not get anything out of it and wanted him to stay; that an argument ensued, during the course of which he told her she was "just an easy make"; and that she then grabbed the knife from the mantle and started toward him.

Defendant described a scuffle between them, stating that it ended in her going "completely down" and rolling onto her back. He then said: ". . . I stood there at first wondering what to do, and so then I picked her up and put her in the bedroom. And to—I guess I just kind of turned away for a second. I grabbed the cord from the lamp and I tied it around her throat. So she was stabbed, the sexual part of it came suddenly, she was stabbed, and I tied—and I tied—the cord around her neck."

Defendant reiterated, and elaborated upon, his confession on the witness stand, with a few changes in detail. At that time he indicated that he put the cord around Mrs. Dunn's neck after he had brought her, in her unconscious condition, to the bedroom, because he was afraid "she might try to kill me again or something."

There was testimony that at no time did any of the police officers, or anyone in their presence, threaten defendant with

any physical force or violence or use any physical force or violence on him; that at no time did they, or anyone in their presence, make any promises of reward or immunity to defendant; and that, as far as they could tell, all the statements made to them, or in their presence, by defendant were entirely free and voluntary on his part.

**Questions.** First. *Were defendant's statements taken in violation of his constitutional rights and thus improperly submitted to the jury?*

*No.* Sergeant Stevens testified that when defendant came to the police station with his parents at 9:35 a.m. on February 25, 1965, "I introduced myself and Officer Wright, and I then told him [defendant] that he didn't have to make any statement, that any statement that he did make could be used in court, and that he was entitled to an attorney. I asked him if he understood that, and he said yes."

Mr. Gardella, the polygraph examiner for the police department, testified that after defendant was brought to his office around 2 p.m. on February 25, 1965, he told him exactly how the test would be administered, and said: ". . . I then informed Eli that he has to volunteer for this, and at this time I informed him that anything he can say to me can be used in a trial and that he has a right to counsel. At the same time I submitted to him what I call a 'statement of consent' which I had him read. After he read this I asked him if he had any questions to ask me about it. He indicated by saying, 'No.' Then I asked him to sign the statement of consent for me to interview him by signing the top line and the bottom line." He further testified that defendant did so sign.

The stenographic statement taken later that afternoon, and introduced in evidence at the trial, shows the following initial questions and answers: "Q. (By Sergeant Stevens): Nate, you recall that earlier today before we talked to you that we advised you of your constitutional rights, that you weren't required to make any statement, that any statements you did make could be used in court, and you had the right to an attorney. Do you recall that? A. Yes. Q. I am giving you that same admonishment now. Do you understand? A. Yes."

Evidence was also presented to the trial judge that on a previous occasion several months earlier, while defendant was in custody on a charge of violating certain provisions of the Vehicle Code, he was advised of his constitutional rights. A statement signed by defendant at that time, admitting he had

been so informed, was before the trial judge in the present case at the time he ruled that the statements were admissible.

Under the circumstances, the trial judge's finding that defendant was properly advised of his constitutional rights is amply supported by the evidence.

Defendant contends that under the holding in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the warning given to him should have included advice that he had the right to have an attorney present at his interrogation and that if he could not afford an attorney, one would be appointed for him if desired.

Defendant's conviction was not final before *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], was decided, but his trial began before *Miranda* was decided. Accordingly, under our holding in *People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 295, 423 P.2d 221], he is entitled to the benefit of the rules laid down in the former case, but is not entitled to the benefit of the holding in *Miranda.*

As a result, it was not necessary that the warning to defendant include advice that he was entitled to have an attorney present at his interrogation and that if he was indigent, an attorney would be appointed for him if desired.

Defendant further contends that his statements were the product of coercion, because they were given after lengthy interrogation conducted while he was in custody at police headquarters. He says that it was ''the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part'' that caused him to speak and that therefore, under the *Miranda* holding, his statements were inadmissible.

As indicated above, the holding in *Miranda* is inapplicable here. In any event, however, the in-custody interrogation in the *Miranda* case differed markedly from that which took place in this case, the defendant in *Miranda* not having been advised of his constitutional rights prior to the interrogation.

Defendant, on the other hand, was advised of his rights. He was not given all the warnings which *Miranda* holds are now required, but the warnings given were adequate under the law then in effect. (See *Escobedo* v. *Illinois, supra,* 378 U.S. 478.)

Defendant argues that he was denied his right to

. . . .

74

counsel, because his parents asked if he could have an attorney or counselor with him during the police interrogation and were told it was not necessary.[1]

The police officers testified that there was no discussion with the parents regarding the possibility of having an attorney represent defendant. In any event, however, defendant's parents admitted that no one told them they could not have an attorney present; they said only that the police officers had told them it was unnecessary, as defendant was just being routinely questioned.

Defendant's father also testified that he telephoned an attorney, whose name he had obtained from the yellow section of the telephone directory, and discussed the possibility of the attorney's being present at the interrogation, but decided against it when the attorney advised that he would charge a $100 fee. This clearly shows that defendant's father did not consider that the police had refused them the right to have an attorney present at the interrogation.

Defendant's parents also testified that they asked if they could be present while defendant was being interrogated, but were told that it was not customary and that the police preferred to question him alone. They admitted, however, that there was no outright refusal to permit them to be present. ■ Furthermore, the right to "counsel" at an interrogation does not include a right for a young man almost 21 years old to have his parents present.

■ Defendant contends that at no time during his interrogation was he informed directly that he was suspected of being responsible for the death of Mrs. Dunn and that he was therefore deprived of any chance to make a meaningful decision with respect to a waiver of his constitutional rights.

Defendant appeared at the police station around 9:30 a.m. He was questioned there regarding his activities at the Dunn residence on the night of the murder, and the officers asked if they could examine the clothes he was wearing that night and also his car. They went together to defendant's house, where defendant turned over to the officers the suit and shirt he had been wearing that evening. The officers told defendant they wanted to take the clothes "downtown to check them over."

[1]Under the holding in *Miranda*, if an accused states that he wishes an attorney, interrogation must cease until an attorney is present. As indicated above, however, the *Miranda* case is inapplicable here.

After picking up the clothes, they drove to Chula Vista to examine defendant's car. When defendant indicated the shoes he was wearing that night might be a pair still at his home, the officers went back to his home to obtain them.

Upon returning to the police station, they continued with a discussion of the facts of the case. After lunch the officers asked defendant if he would be willing to take a lie detector test. He agreed, and a little after 2 p.m. he was taken to see Mr. Gardella, the polygraph examiner.

These circumstances should have indicated to defendant that he was then being regarded as a suspect and would probably be accused of the crime. In any event, however, the record shows that after the lie detector test had been administered, Mr. Gardella told defendant that because of the deception revealed by the results of the test, it was his opinion that defendant had taken Mrs. Dunn's life. It was after this that defendant, who had been advised of his constitutional rights when he came to the police station that morning and had been reminded of them by Mr. Gardella just before the lie detector test was administered, made his statements, without ever having requested counsel.

Defendant also argues that in addition to warning him, the officers should have ''offered'' counsel to him. None of the cases decided by this court have required such a procedure. Police officers have no authority to employ attorneys for possible defendants, nor would it be proper for them to do so. This is a function reserved to the courts, where the proper selection of attorneys can be made.

Defendant argues that since he was a minor, his parents should have been notified of his arrest. (Pen. Code, §§ 858, 859.) His parents, however, were the very persons who brought him to the police. Under the circumstances, a notice would have been superfluous.

In addition, defendant was not under arrest until after he confessed, and sections 858 and 859 of the Penal Code are not applicable until an arrest has been made. Furthermore, those sections place a duty on the magistrate, not the police, to notify the parents.

Second. *Did the trial court err in not submitting to the jury the question whether defendant's statements were made after a proper warning and a waiver of his right to counsel?*

*No.* ■ Before an admission or confession is admitted in evidence, the trial judge must find that it was voluntarily given and that the defendant's right to counsel and right to remain silent were not violated. (*People* v. *Schader,* 62 Cal.2d 716, 727 [9] [44 Cal.Rptr. 193, 401 P.2d 665].)

In the present case, extensive evidence on these points was presented before the trial judge outside the presence of the jury, and the trial judge found that defendant's statements were voluntarily given and that his constitutional rights were not violated. This finding by the trial judge insures that the issues were reliably determined. (See *People* v. *Schader, supra,* 62 Cal.2d at p. 728 [10].)

■ Moreover, under the rules applicable before the adoption of the Evidence Code effective January 1, 1967 (see § 405), even after the trial judge had made a reliable determination of the issues whether an admission or confession was voluntarily given and whether the defendant's constitutional rights were violated in the taking thereof, the defendant might, if he wished, present evidence on such issues for the consideration of the jury, and the jury then had to be permitted to make the final determination. (See *People* v. *Gonzales,* 24 Cal.2d 870, 877 [151 P.2d 251].)

Under such circumstances, a defendant was entitled to have the jury pass upon the issues even if he had failed to request an instruction to that effect, it being the duty of the trial court to give such an instruction on its own motion. (*People* v. *Bevins,* 54 Cal.2d 71, 77 [4b] [4 Cal.Rptr. 504, 351 P.2d 776].)

In the present case, both in the proceedings conducted before the trial court outside the presence of the jury and in the proceedings conducted before the jury, the prosecution introduced evidence that defendant had voluntarily given his statements, and defendant introduced evidence by which he sought to show that he had not given them voluntarily. Accordingly, defendant was entitled to have the jury determine the issue, and the trial court properly so instructed.

■ The prosecution also, both in the proceedings conducted before the trial judge outside the presence of the jury and in the proceedings conducted before the jury, presented evidence that defendant was fully advised of his constitutional rights.

In the proceedings conducted before the trial judge outside the presence of the jury, defendant testified that he was never

advised of his right to counsel, and his parents testified that they requested permission to have an attorney or counselor present at the interrogation but their request was not granted. No such evidence, however, was presented to the jury.

Since there was no evidence before the jury to support a finding that defendant was not properly advised of his constitutional rights, the issue was not one for the jury's determination, and defendant must be deemed to have waived any right to question the reliable determination made by the trial judge.

 Third. *Did the police coerce defendant in order to obtain his confession?*

*No.* Defendant contends that coercion was used to obtain his confession. His basis for this assertion is his reply to the officers of "maybe psychological, but surely not physical," when asked if any force had been used on him to obtain the stenographic statement.

An examination of the record shows that the only remark of this nature was the one contained in the stenographic statement introduced in evidence by the prosecution. Defendant while on the stand made no claim that any psychological coercion was used, and in his argument here refers to no other instance where such testimony was introduced.

There was no evidence of "psychological coercion," and the testimony of the officers clearly shows that there was no coercion.

 Fourth. *Was there misconduct in the cross-examination of defendant's character witnesses?*

*Yes.* Defendant contends that there was prejudicial misconduct in the cross-examination of his character witnesses. Defendant put on two witnesses to testify as to his character.

Edwin Paxton Stokes, Jr., testified that defendant had a good reputation for being a law-abiding citizen and did not have a reputation as being a violent person.

On cross-examination, the witness was asked if he had heard that (1) at 15 defendant had stolen a tractor and trailer, (2) that defendant had stolen a truck from a lumber company, (3) that defendant had broken into a tire recapping company on three occasions and had stolen money, (4) that in the Navy he was absent from his place of duty on two occasions and was absent without leave for 14 days on one

occasion, (5) that in about 1962 he forcibly held his girl friend and forced her to watch him masturbate, and (6) that in Japan he stole stereo equipment from a Japanese girl.

The witness, after testifying that he had heard only of (4), was asked what his opinion would be if he had heard of the others. He stated that his opinion about defendant's good reputation would be the same.

Mrs. Heaton was then called to the stand and testified that defendant had a reputation for being a law-abiding citizen and that she had never heard anyone speak of defendant as being a violent person. On cross-examination she was asked if she had heard the above, and she denied having heard the reports.

When asked if she had heard them, the following occurred: "Q. Yes, if you had heard these things. A. Oh, that's hard to answer. This is the first I've ever heard of anything like this and I can't believe it. I just can't believe it. Q. The question is, if you heard these things, would your answer be the same? A. He was fourteen, fifteen, you say, when these things happened? Q. You say you have difficulty and you don't know what to say, is that right? A. No, sir. I just can't believe it. I hadn't heard any of this before. The way I feel is that youngsters do things and it doesn't necessarily keep them from becoming a good citizen as they grow older."

The law of evidence relating to proof of reputation in criminal cases is "archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counterprivilege to the other." (Jackson, J., in *Michelson* v. *United States* (1948) 335 U.S. 469, 486 [93 L.Ed. 168, 69 S.Ct. 213].)

When a defendant elects to initiate inquiry into his own character, presumably to establish that one with his lofty traits would be unlikely to commit the offense charged, an anomalous rule comes into effect. Opinion based upon hearsay is permitted. (Evid. Code, § 1324; *People* v. *Cobb* (1955) 45 Cal.2d 158 [287 P.2d 752].) But the price a defendant must pay for attempting to prove his good name is to throw open a vast subject which the law has kept closed to shield him. (Evid. Code, §§ 1101, 1102.) The prosecution may pursue the inquiry with cross-examination as to the contents and extent of the hearsay upon which the opinion was based, and may disclose rumors, talk, and reports circulating in the community. This, as Justice Jackson suggests (*supra*, 335 U.S. at p. 480), "opens a veritable Pandora's box of irrespon-

sible gossip, innuendo and smear." The result may be the raising of collateral issues to complicate the trial, confuse and distract the jurors, and becloud the principal issues of the litigation.

Into the foregoing category we place at least two of the questions asked by the prosecutor on cross-examination in the instant case. The first was whether the witness "had heard" that in 1962 the defendant forced his girl friend to watch him masturbate. The repulsive nature of the act, if indeed it occurred, is certain to affect opinion of the defendant. But the issue is reputation in the community (Witkin, Cal. Evidence (2d ed. 1966) § 1238), and it is highly unlikely that a sex act committed in privacy would become a topic of general community comment unless legal action had resulted therefrom. The record does not indicate any proceedings resulted from this incident. The second question concerned an involved plot in which the defendant purportedly planned to assault and rape a girl. Since the scheme did not materialize, an objection to the question was properly sustained; but the jury heard the query, one in a cumulative series designed to reflect upon defendant's reputation. This is a valid illustration of Justice Rutledge's criticism in his dissent in *Michelson, supra* (335 U.S. at p. 492) : "many incidents, wholly innocent in quality, can be turned by the prosecutor, through an inflection or tone, to cast aspersion upon the defendant by the mere asking of the question, without hope of affirmative response from the witness."

Counsel must not be permitted to take random shots at a reputation imprudently exposed, or to ask groundless questions "to waft an unwarranted innuendo into the jury box" (*Michelson, supra*, 335 U.S. at p. 481). To avoid excesses in efforts to destroy or to rehabilitate character evidence, trial courts are invested with discretion to limit the number of witnesses on the subject and to control cross-examination. There is also a responsibility on trial courts to scrupulously prevent cross-examination based upon mere fantasy. This may best be done by first ascertaining, *outside the presence of the jury,* "that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation." (*Ibid.,* p. 481; but note the paradoxical character of this procedural requirement as colorfully described by Justice Jackson in fn. 18, p. 481.)

Failure to adapt the foregoing course to the instant case was error. But in view of all the evidence, we cannot find the error to be prejudicial. (Cal. Const., art. VI, § 13.)

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied March 29, 1967. Peters, J., was of the opinion that the petition should be granted.