[Crim. No. 9977.    In Bank.    Apr. 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOE GON-
ZALES and DANIEL ALARCON, Defendants and
Appellants.

Leighton G. Long and James H. Kovacs, under appointment by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—A jury found defendants Joe Gonzales and Daniel Alarcon guilty of murder in the first degree (Pen. Code, §§ 187, 189) and of robbery in the first degree (§§ 211, 211a). After a penalty trial on the murder count, a jury fixed the punishment of Gonzales at death. Alarcon waived a jury trial as to penalty and the court fixed his punishment at life imprisonment. Gonzales was sentenced on the murder count to death and on the robbery count to state prison for the term prescribed by law. Alarcon was sentenced to state prison for life on the murder count and for the term prescribed by law on the robbery count. Alarcon appeals from the judgment of conviction. The appeal of Gonzales is automatic. (Pen. Code, § 1239, subd. (b).)

Since defendants do not question the sufficiency of the evidence to sustain the convictions, our recital of the facts will not extend to those matters unimportant to a consideration of

the issues raised before us. We first set forth certain uncontradicted facts in the record which relate to Gonzales' main contention that the admission of his codefendant's extrajudicial statements constituted prejudicial error. We also set forth at this point facts having a bearing on additional contentions made by defendants or either of them. We discuss, *infra*, in our separate consideration of still other questions raised on appeal, the facts pertinent to each.

The events here in question took place in Oxnard on Friday, July 30, 1965. During the evening hours preceding 10 p.m. defendants Joe Gonzales and Daniel Alarcon, together with David Alarcon (the younger brother of Daniel) and Bobby Joe Barkley (a friend of David Alarcon), were riding around or "cruising" in Daniel Alarcon's automobile. Of this group Joe Gonzales, aged 24, was the eldest; Daniel Alarcon was 19 years of age, his brother David was 15 years of age, and Bobby Joe Barkley was 14 years of age. David Alarcon was driving the automobile because Daniel had been drinking earlier in the day and was feeling "high" and quite jovial. Gonzales had also been drinking, but he had not consumed as much as Daniel and manifested no effects.

The group "cruised" for some time in and around La Colonia, which is a Mexican-American section of Oxnard near the railroad depot. At approximately 10 p.m. their car ran out of gasoline at a point near the railroad yard and a short distance from the Alarcon residence, which was located at the other side of the yard. Daniel Alarcon suggested that they walk to his house to get some money to buy gas. The group thereupon set out on foot across the railroad yard on their way to Alarcon's home.

While walking across the yard they sighted three older men who were also crossing the yard, but from a different direction: Jesus Ontiveros, aged 35; Juan Baca Lujano, aged 54; and Felix Perez Servin, aged 35. These men had been drinking beer at several bars near the yard and were headed toward another bar in the vicinity. Ontiveros, who had been drinking beer since late afternoon, was quite intoxicated. The two groups came together, and a fight erupted. Servin fled, but the conflict continued with Gonzales, Ontiveros, and Lujano the chief participants. Knives were produced,[1] and all parties

---

[1] It was undisputed that Gonzales and Lujano had knives and wielded them; that Ontiveros had a knife, although whether he used it was in dispute; and that Daniel Alarcon, David Alarcon, Bobby Joe Barkley, and Felix Servin neither had nor used knives.

involved, excepting Barkley, received knife wounds. Gonzales inflicted very severe wounds upon Ontiveros and Lujano. In a very short space of time the conflict was ended. Lujano's wallet was taken from him. The group of youths fled, leaving Ontiveros and Lujano lying in the yard severely wounded.

The police arrived about 10:30 p.m., found Ontiveros and Lujano lying on the ground, and took both to the hospital. Both men had a number of knife wounds and were bleeding profusely. Ontiveros, upon admission to the hospital, was found to be in a state of irreversible shock due to loss of blood, and he died the next morning. Lujano, although in a critical condition, subsequently recovered from his wounds.

Among the items found by police at the scene of the altercation was a glass cutter.

The prosecution of defendants[2] for first degree murder proceeded on a theory of felony-murder robbery. Accordingly, both sides introduced evidence bearing on the question whether, prior to the confrontation, Gonzales and his associates formed an intention to rob someone, and, if so, whether the fatal clash was the result of an attempt to carry out that intention. The evidence produced by the prosecution which could have been properly considered by the jury in support of its finding on this issue falls into the following three categories: (1) Evidence pertaining to Lujano's wallet; (2) evidence pertaining to Ocho's bar; and (3) the testimony of Bobby Joe Barkley.

(1) As above noted, there was evidence to the effect that Lujano's wallet[3] was taken from his person at the conclusion of the fight and after Ontiveros had sustained mortal wounds. This evidence was essentially undisputed by the defense, though Gonzales denied any knowledge of the wallet or of the fact that, as the prosecution claimed and Daniel Alarcon admitted, the wallet had been destroyed by burning when the group returned to the Alarcon residence after the fight. ▉ The jury was properly instructed that intent to rob formed subsequent to the infliction of mortal wounds was not sufficient to support a finding of first degree felony murder. (See *People* v. *Carnine* (1953) 41 Cal.2d 384, 388 [260 P.2d 16]; *People* v. *Jeter* (1964) 60 Cal.2d 671, 676-677 [36 Cal.

---

[2]Bobby Joe Barkley and David Alarcon, each being less than 16 years of age at the time of the offense, were not subject to criminal prosecution. (See Welf. & Inst. Code, §§ 606, 707.)

[3]The wallet contained no money, but it contained Lujano's identification cards and papers.

Rptr. 323, 388 P.2d 355] ; cf. *People* v. *Clark* (1965) 62 Cal.2d 870, 887 [44 Cal.Rptr. 784, 402 P.2d 856].)

(2) Evidence was produced to the effect that, about two hours prior to the conflict in the railroad yard, Joe Gonzales was present at a bar in La Colonia known as Ocho's, and that Ontiveros was also there at that time and was paying for rounds of beer with 20-dollar bills. This evidence, however, was contradicted by the testimony of all four members of the Gonzales group, including Bobby Joe Barkley, for their testimony was that Gonzales was "cruising" with the other three members of the group at the time in question.

(3) By far the most significant evidence produced by the prosecution on the issue of intent was found in the testimony of Bobby Joe Barkley, the youngest of defendants' minor associates on the night in question. Barkley first related certain events which led up to the unfortunate walk across the railroad yard. He testified that he arrived at the Alarcon residence about 5 p.m. in the afternoon of July 30; that both Alarcon boys were there and that Joe Gonzales was talking with Daniel Alarcon; that he (Barkley) and his friend David Alarcon went to a nearby pool hall for a short time and that when they returned he overheard Daniel Alarcon asking his uncle, who also lived at the Alarcon residence, to lend him a glass cutter; that after the uncle gave Daniel the glass cutter, Barkley overheard Daniel and Gonzales speaking about using it for the purpose of "gettin' into some place and get something out of it in town"; that shortly thereafter the four youths left in Daniel Alarcon's car and began "cruising"; that after a time they stopped in back of a certain store building[4] near the railroad yard, got out of the car, and began to walk around to the front of the building; that Gonzales then told Barkley and David to return to the car and bring it around to the front of the building; that Barkley and David returned to the car, but it would not run and they determined that it was out of gas; that Barkley and David then walked to the front of the store and told Gonzales and Daniel that the car was out of gas; that Daniel then suggested that they walk to his house to get some money that he had there; and that the group pursuant to this suggestion set out toward the Alarcon residence.

The vital portion of Barkley's testimony involved the

---

[4]Barkley's testimony as to actions undertaken relative to the store building was received over vigorous objection on the grounds of irrelevancy and undue prejudicial effect.

events which thereafter occurred. Barkley testified that as the group was proceeding down the street, before they entered the railroad yard, Gonzales suggested they ''roll'' someone; that this suggestion was received by the other members of the group as a joke; that as the group continued down the street they saw a man come out of a cafe and Gonzales suggested that they ''roll'' him; that this suggestion was also received as a joke, and the man turned down another street and was not seen again; that when the group entered the railroad yard Gonzales said ''Let's roll someone, roll someone if we see 'em over here''; that when Ontiveros, Lujano, and Servin were sighted Gonzales said ''Let's roll these guys here instead of going home and getting some gas money or anything like that''; that David Alarcon answered ''There are too many of them,'' but Gonzales said ''They're probably drunk anyway, could probably take 'em''; that he (Barkley) then became temporarily separated from the group (''I just stayed on that little trail going through the bushes''); that the fight erupted during his momentary absence, and he was drawn into it only when he was attacked by one of the three men; that during the conflict Lujano came at him brandishing a knife, but the other three members of the group came to his aid and Lujano, after superficially wounding Gonzales and the two Alarcons, finally succumbed as a result of repeated stab wounds administered by Gonzales; that Daniel Alarcon then told Barkley to take Lujano's wallet, and when Barkley did not respond Daniel himself took the wallet; that they then fled; that when the group arrived at the Alarcon residence David Alarcon admitted to his mother that they had tried to rob some men; and that Daniel Alarcon then gave his mother the wallet, which was subsequently destroyed by burning.

Barkley's testimony was vigorously challenged by the defense. The thrust of the cross-examination was that Barkley had given several differing versions of the incident prior to trial. It was shown, for example, that he had testified before the grand jury to the effect that the Alarcon car had run out of gas while it was in motion, that the four boys had pushed it into the parking area behind the store building and that they had immediately set out on foot for the Alarcon residence;[5] that upon entering the railroad yard they had discussed robbing someone there but that they did not intend to rob Ontiveros and his friends because they were too big and

---

[5]Both defendants and David Alarcon testified to this effect at the trial.

too many; that the Ontiveros group somehow got the impression that the youths intended to rob them and took the offensive against Barkley and his companions; and that after the fight, upon the return of the four to the Alarcon residence, Barkley heard no admissions to the Alarcons' mother, or discussions of the wallet, because he was in the other room watching television. When confronted on cross-examination with this version of the incident, as well as with other versions given prior to trial to defense counsel and certain police officers, Barkley represented that he had lied in all of his pretrial statements because he "just wanted to." He concluded that his courtroom testimony was "the truth—more the truth than it was in Grand Jury." On redirect Barkley testified that he had lied in his pretrial statements in order to protect his friends.

It was also brought out in cross-examination that Barkley had first related the incident involving the glass cutter to a police officer at the juvenile hall about a week and a half prior to the trial, and that he was shortly thereafter released from "lock up" or restricted confinement at the hall—though David Alarcon was not so released. Other testimony produced by the defense cast doubt upon the glass cutter story. The Alarcons' uncle, who had allegedly given the glass cutter to Daniel Alarcon, denied having done so and also denied that the glass cutter found at the scene of the fight belonged to him. This testimony was substantiated by a criminalist from the sheriff's office who compared the cutter in question with three others claimed by the uncle to be his own. The criminalist testified that there was no paint transfer between the three cutters produced by the uncle and the cutter that was found at the scene.

Cross-examination also revealed a source of possible bias against Daniel Alarcon. It was shown that prior to the evening of the fight Daniel had caught Barkley, David Alarcon, and another boy throwing rocks at an old man and had rebuked them and threatened physical violence if they repeated the incident.

Finally, two teachers at Barkley's school testified that his reputation for truth, honesty, and integrity in his school and community was not good; that he was "somewhat of an habitual liar"; and that they would not believe him under oath. The prosecutor's cross-examination of the teachers implied that other teachers at the school had a different

opinion as to Barkley's reputation, but these teachers were not produced at the trial.

The defense evidence on the crucial issue of intent to rob consisted primarily of defendants' unequivocal denials that any such intent existed prior to the confrontation. Defendant Daniel Alarcon testified in relevant part that on the afternoon of the altercation he drank six 16-ounce cans of beer and two glasses of vodka with orange juice and that he was quite intoxicated when the group was "cruising" during the evening; that at no time during that evening did he hear any mention of "rolling" anyone; that after the group entered the railroad yard he hopped on a slow-moving train and rode it for a certain distance; that when he jumped off the train he could not see the others but that he then heard Gonzales calling "Dan!"; that he proceeded toward the voice, saw a group of persons together, and heard some cursing in Spanish; that he concluded that a fight was in progress, ran to aid his brother, and thus became involved in the conflict; that he neither told Barkley to take Lujano's wallet nor took the wallet himself; that as the group was headed toward his house after the fight Barkley gave him the wallet, which Barkley then said had fallen from Lujano's pocket during the fight; that when the group returned to his house he gave the wallet to his mother and told her what had happened; and that the wallet was subsequently destroyed by burning. Daniel Alarcon denied any knowledge of the glass cutter or of the events which Barkley's testimony connected with it.

Defendant Gonzales testified in relevant part that the matter of "rolling" anyone was at no time discussed on the evening in question; that after the group had entered the railroad yard and Daniel had hopped on the train, he (Gonzales) continued walking behind Barkley and David Alarcon, who were a short distance ahead of him; that he saw ahead of him the silhouettes of three men moving toward Barkley and David; that he looked around for Daniel, then turned to see a fight going on between the three men and the two youths; that he called for Daniel, then moved up to aid Barkley and David; that he was then confronted by Ontiveros, who struck at him with a knife; that only then did he draw his knife and attack Ontiveros; that he later attacked Lujano in order to aid Barkley and Daniel Alarcon, who were being attacked by Lujano armed with a knife; that he did not hear anyone say to get Lujano's wallet; and that, upon the arrival of the group at the Alarcon residence, he heard no mention of the

wallet and did not see it burned. Joe Gonzales denied any knowledge of the glass cutter or of the events which Barkley's testimony connected with it.

The final piece of defense evidence bearing upon the account of Bobby Joe Barkley was the testimony of David Alarcon. David, like Barkley, testified that Gonzales made some statements about "rolling" somebody before the group entered the railroad yard and that these statements were the subject of playful joking. He also testified, however, that the discussion never went beyond this stage, and that no mention of robbery was made after the group entered the yard. David further said that the fight began when Lujano began arguing with him; that Lujano told him to go home because he was "just a little kid" and then, after further argument, struck him; that he (David) retaliated with a blow and the fight commenced; and that he knew nothing about Lujano's wallet. David Alarcon denied any knowledge of the glass cutter or of the events which Barkley's testimony connected with it.

Finally, and for the sake of completeness, it should be noted that the testimony of Lujano and Servin, though conflicting in many respects with defense testimony, contained nothing directly bearing upon the issue of intent. The burden of their testimony was simply that Gonzales and his associates were the aggressors in the conflict. Neither Lujano nor Servin even remotely intimated that a demand for money was made upon them.

It is in light of the above factual context that we turn to a consideration of defendant Gonzales' primary contention, that error prejudicial to him resulted from the introduction and use by the prosecution of certain extrajudicial statements made by his codefendant Daniel Alarcon. This contention rests squarely upon our decision in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].[6]

The extrajudicial statements to which Gonzales has reference were two in number. Defendant Alarcon's first statement, covering 23 pages of reporter's transcript, was introduced over objection by Gonzales as a part of the prosecution's case-in-chief; it was conditioned by instructions and admonitions limiting its application to the declarant Alarcon. Defendant Alarcon's second statement was longer and more

[6]As we recently held in *People* v. *Charles* (1967) *ante,* p. 330 [57 Cal.Rptr. 745, 425 P.2d 545], the rules established in *Aranda* are applicable to cases wherein the judgments of conviction are still pending upon appeal. This is such a case.

detailed. A portion of it covering 55 pages of reporter's transcript was also introduced over Gonzales' objection as a part of the prosecution's case-in-chief; it was also conditioned by careful limiting instructions and admonitions. Another portion of the second statement was used, along with excerpts from the first portion of that statement, by way of impeachment during the cross-examination of Daniel Alarcon.

The first statement was given during an interview of Daniel Alarcon by a police lieutenant named Hawkins. In this interview Daniel, after being fully advised of his rights to remain silent and to have counsel,[7] stated *inter alia* that after the car had run out of gas and the four had started across the railroad yard, they met Ontiveros and his group; that "I guess I asked—we asked them for a match or something and they started to cuss or something and then one of them took out the knife and cut me here in my hand"; that this incident commenced the fight; that Joe Gonzales later told him that he (Gonzales) had used a knife in the fight and "had knifed those guys"; that none of the other members of the group had knives; that he knew nothing about Lujano's wallet; that Joe Gonzales told him to keep quiet about the encounter; that when the group returned to his home after the fight he told his mother that they had been attacked by some men; that there was no intent to rob anyone; and that he did not report the matter to the police because he was "too scared."

The second statement was given during an interview of Daniel Alarcon by a deputy district attorney named Kosmo and some police officers. In this interview Daniel, after being fully advised of his rights to remain silent and to have counsel,[8] recounted in greater detail the story related to Lieutenant Hawkins at the earlier interview. In addition, however, he stated that he had only two beers during the afternoon of July 30 and that Gonzales had, to his knowledge, nothing to drink that afternoon and evening. He also mentioned for the first time that he had, immediately prior to the fight, taken a short ride on a slow-moving freight train

[7]The admonition administered complied fully with the requirements laid down in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. The instant case was tried prior to June 13, 1966, and is therefore not subject to the standards enunciated in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. (See *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

[8]See fn. 7, *supra.*

moving through the yard, and he admitted that he was to some extent afraid of and dominated by Gonzales.

It is clear that the admission of Daniel Alarcon's extrajudicial statements, even with careful instructions and admonitions limiting their application to the declarant, constituted error of the type condemned in *People* v. *Aranda, supra,* 63 Cal.2d 518, for they inculpated defendant Gonzales, the nondeclarant, as the central figure in the momentary but tragic confrontation in the Oxnard railroad yard. The question herein is whether that error had a prejudicial effect. (See *People* v. *Gilbert* (1965) 63 Cal.2d 690, 702 [47 Cal.Rptr. 909, 408 P.2d 365].)

It is the Attorney General's argument that the statements effected no prejudice to Gonzales because they were wholly cumulative of evidence given by other witnesses including Gonzales himself. There was no dispute that Gonzales was very much involved in the events in question, that he was the acknowledged leader of the group of young men which became involved in mortal conflict with the three older men in the Ontiveros group, and that he killed Ontiveros with his knife. The only dispute, as pointed out above, was whether Gonzales and his associates, prior to the confrontation, formed an intention to rob someone, and whether the clash was the result of an attempt to carry out that intent. The Attorney General points out that the Alarcon statements contained no positive assertions as to this crucial issue but rather contained only unqualified denials that an intention to rob was formed, and he therefore argues that no prejudice could have accrued from their admission or use.

█ The very aplomb of this formulation betrays some misunderstanding as to the nature of our inquiry. Any meaningful assessment of prejudice must proceed in light of the entire record, and we must therefore consider not only the direct effect of the statements because of *what they say,* but also any indirect effect that they might have had because of *the way in which they were used.* If, after a searching examination of this nature, it appears to us reasonably probable that a result more favorable to defendant Gonzales would have been reached had the extrajudicial statements of Daniel Alarcon not been admitted, we must reverse the judgment. (*People* v. *Charles, supra, ante,* p. 330; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) █ Further, the state of the evidence in this case renders here applicable a fundamental corollary of the general rule: Where the evidence,

though sufficient to sustain the verdict, is extremely close, "any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial." (*People* v. *Briggs* (1962) 58 Cal.2d 385, 407 [24 Cal. Rptr. 417, 374 P.2d 257].) Here, as in *Briggs,* the character of the evidence is "such as requires close scrutiny. . . ." (*People* v. *Briggs, supra,* at p. 404.)

As stated above, the extrajudicial statements of defendant Daniel Alarcon were introduced as a part of the prosecutor's case-in-chief and were also used as a basis for impeachment of the courtroom testimony of said defendant. The impeachment use was limited to pointing out discrepancies between Alarcon's pretrial statements and his courtroom testimony on points collateral to the central issue of intent. In his argument, however, the prosecutor attempted to relate that impeachment to the central issue by maintaining that, since Daniel Alarcon had lied as to the minor points which had been the subject of impeachment, his courtroom testimony on the issue of intent was not worthy of belief. In addition, the prosecutor in his argument sought to extend this impeachment theory from Alarcon alone to both Alarcon *and* Gonzales—to imply that the two defendants had agreed upon a story to tell in court, and that the story had been discredited by the prior inconsistent statements of Daniel Alarcon.

There was, of course, no attempt to argue that Gonzales' courtroom testimony was impeached on specific points by Alarcon's extrajudicial statements, for those statements had been introduced as applicable only to Alarcon. However, the thrust of the argument accomplished much the same effect. For instance, at one point in his argument the prosecutor had reference to an apparent discrepancy between Daniel's courtroom testimony and one of his extrajudicial statements as to whether he was in the immediate area when the two groups initially met. From this discrepancy the following conclusions were urged upon the jury in the prosecutor's argument: "Now, obviously, when he was talking to Lieutenant Hawkins he hadn't a chance to cook up the kind of a story he was going to tell in court and he hadn't had a chance *to confer with Joe Gonzales in detail as to what they would tell in court.* Obviously they had talked together before, but either he didn't remember what *Joe Gonzales and he had agreed to say* or he had got mixed up because he came out and told Lieutenant Hawkins that the four of them were all together when they met the three men." (Italics added.) Later in the argu-

ment the prosecutor expressed the same idea in these words: "This shows the powerful value of talking to these men right after they are arrested and getting a story *before they have a chance to decide what system of lies they are going to tell when they get in court.*" (Italics added.) This line of argument, oriented as it was to the extrajudicial statements of Daniel Alarcon, was heightened in effect by the prosecutor's intimation, also based upon those statements, that Alarcon had a motive for conforming his testimony to that of Gonzales because he was afraid of Gonzales and subject to his domination.

We hold that in the circumstances of this case the erroneous admission of the extrajudicial statements of Daniel Alarcon, and their subsequent utilization by the prosecutor in argument, resulted in prejudice to the defendant Joe Gonzales. Here, unlike in *People* v. *Gilbert, supra,* 63 Cal.2d 690, the evidence that Gonzales was guilty of first degree murder—in this case felony-murder *robbery*—was far from "overwhelming." On the contrary, the evidence concerning the issue of intent to rob, upon which the conviction wholly depends, was very closely balanced. On the one hand were the very questionable testimony of the accomplice Bobby Joe Barkley, the very questionable evidence as to Ocho's Bar, and the evidence of Lujano's wallet—which, though essentially undisputed, was subject to at least one interpretation not supportive of a finding that intent to rob had been formed *prior to* the confrontation. On the other hand were defendants' consistent denials, as well as those of David Alarcon, that any prior intent to rob had been formed. In these circumstances, and in view of the use to which the erroneously admitted extrajudicial statements of Daniel Alarcon were put by the prosecution, we are of the opinion that it is reasonably probable that a result more favorable to defendant Gonzales would have been reached if those statements had not been admitted. We therefore reverse the judgment as to count one (murder) in respect to defendant Joe Gonzales.

We are further convinced that the circumstances of this case require a reversal of the judgment as to count one (murder) in respect to defendant Daniel Alarcon. The jury was here instructed as to the vicarious liability of coconspirators, as well as that of aiders and abettors, and the finding of guilt as to Daniel Alarcon might therefore have been based upon either or both of these theories. However, under the circumstances of this case neither of these bases of liability would

be supportable absent a finding of pre-existing intent to rob on the part of Joe Gonzales, he being the dominant figure in the group. We have concluded that, in a new trial not infected with *Aranda* error, it is reasonably probable that a jury would find that Gonzales had no such intent. Therefore, since the finding of guilt as to Alarcon may have been derived from the questioned finding as to Gonzales, we must reverse the judgment convicting Alarcon of first degree murder.

The conclusions which we have reached in regard to both defendants as to the murder count compel a reversal of the judgments against them as to the robbery count. While the existence of an intent to rob *prior* to the confrontation was indispensable to a conviction of murder, the existence of such intent *at the time of the taking* of Lujano's wallet would be adequate to establish this requisite element of the offense of robbery. It will be recalled that under the evidence either Daniel Alarcon or Bobby Joe Barkley took the wallet from Lujano after the latter and Ontiveros had been rendered defenseless by knife wounds. This evidence, however, although seemingly supportive of the robbery convictions, does not immunize them against the prejudicial taint of the *Aranda* error.

The underlying theory of the prosecution as to robbery as well as to murder was one of conspiracy. The conviction of robbery against Gonzales was *wholly* based on such theory because the evidence is undisputed that Gonzales had no part in the actual taking of the wallet. There is no evidence showing or from which it can be reasonably inferred that between the time Ontiveros and Lujano were *hors de combat* and the time the wallet was taken, a conspiracy was formed so as to fasten upon Gonzales guilt for the taking of the wallet by Daniel Alarcon or Bobby Joe Barkley. It is therefore clear that, in order to find Gonzales guilty of robbery, the jury was required to resort exclusively to the evidence of intent prior to the infliction of mortal wounds—which evidence was, as we have pointed out above, infected by prejudicial *Aranda* error. We therefore conclude it reasonably probable that a result more favorable to defendant Gonzales as to the robbery count charged against him would have been reached absent the *Aranda* error.

Defendant Alarcon was connected to the taking of Lujano's wallet not only by evidence tending to show conspiracy, but also by the testimony of Bobby Joe Barkley to the effect that he (Alarcon) personally took the wallet from

Lujano's body. Alarcon's own testimony, it will be remembered, was to the effect that it was Barkley who actually took the wallet and that he (Alarcon) knew nothing of it until the group was headed back toward his home after the fight. It is clear, however, that the jury might have disbelieved Barkley and yet found against Alarcon as to the robbery count on a conspiracy theory. As we have observed above, the evidence supportive of such a theory was tainted with *Aranda* error as to Gonzales and it is reasonably probable that absent such error the jury would not have determined that a conspiracy to rob was formed prior to the confrontation. Since the jury might have based its finding of Alarcon's guilt on the robbery count upon its finding of conspiracy, rather than its belief of Barkley's testimony that Alarcon took the wallet, the judgment on that count must be reversed.

Although our reversal of the judgments on the grounds above discussed renders unnecessary a treatment of the several other contentions raised, we set forth our views on three of those contentions for the guidance of the court upon retrial.

▮ Defendant Gonzales contends that it was error, upon the prosecution's challenge for cause, to exclude from the jury prospective jurors who, in response to questions of the prosecutor asked over objection on *voir dire,* expressed unequivocal opposition to the death penalty. He recognizes that section 1074 of the Penal Code permits a challenge for implied bias if the offense charged is punishable with death and it is shown that the prospective juror "entertain[s] . . . such conscientious opinions *as would preclude his finding the defendant guilty.*" (Italics added.) He also recognizes that this court has held that, while section 1074 does not expressly compel exclusion of a prospective juror whose "conscientious opinions" render him incapable of exercising proper discretion as to *punishment* (Pen. Code, § 190), still its purpose would be violated if such persons were allowed to serve on the jury. (*People* v. *Riser* (1956) 47 Cal.2d 566, 575-576 [305 P.2d 1].) It is his contention, however, that the subsequent adoption of section 190.1 of the Penal Code in 1957 (Stats. 1957, ch. 1968, § 2, p. 3509) providing for a *separate penalty trial,* renders the reasoning in *Riser* presently inapposite. He attaches particular significance to that portion of section 190.1 authorizing a new jury on the issue of penalty "for good

cause shown.''[9] Since a separate jury can be chosen to try the issue of penalty, it is argued, the jury trying guilt issues should not be chosen with reference to contingent penalty considerations, but should be selected only on the basis of its ability to determine guilt issues. In this way, defendants point out, we would return to the plain meaning of section 1074 and allow challenges for implied bias only when the ''conscientious opinions'' of a prospective juror would affect his guilt-determining ability.

In *People* v. *Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222], we recently considered the precise issue here presented. We there held as follows: ''The point is without merit. The enactment of section 190.1 can in no way be construed as evidence of legislative intent to overrule our decision in *Riser*, which has since been cited in two further decisions of this court rejecting the argument here advanced by Smith. [Citations.] On the contrary, a full quotation of the relevant sentence of section 190.1 [see fn. 9, *supra*] discloses a directive of the Legislature that whenever possible the same jury shall serve at both phases of the trial for reasons of continuity and economy of effort. This directive of the Legislature neither denies the defendant due process of law nor favors the prosecution over the defense.'' (63 Cal.2d at p. 789; see also *People* v. *Gilbert, supra,* 63 Cal.2d 690, 711-712; *People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 882-883 [56 Cal.Rptr. 635, 423 P.2d 787].)

Gonzales takes issue with the final sentence above quoted and urges a reconsideration of our position. It is argued that the institution of ''death-qualified'' jurors in capital cases denies a defendant the right to be tried by a ''fair and impartial jury'' of his peers (Pen. Code, § 1078; U.S. Const., Amend. VI) because (1) a *guilt* jury from which persons opposed to the death penalty have been excluded is not a representative sample of the community, and (2) such an unrepresentative jury is neither fair nor impartial in its *guilt* determination due to the fact that persons without conscientious scruple against the death penalty tend to be persons with the kind of ''authoritarian personality'' which is more

---

[9] The precise wording of the section in this regard is as follows: ''If the defendant was convicted by a jury [in the guilt trial], the trier of fact shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty.''

responsive to the prosecution's case than to the defendant's case.[10]

These arguments, while superficially attractive, simply do not stand against the reasoning of our *Smith* and *Gilbert* cases. First, as to the matter of "representative sampling," it is clear that such an ideal has never been the practice of the criminal law. The very reason for challenges for cause is to weed out that part of the random sample having characteristics thought to render objective judgment difficult. Second, as we pointed out in *Smith* and *Gilbert,* the Legislature through its enactment of section 190.1 of the Penal Code (see fn. 9, *supra*) expressed a preference for a single jury qualified to act throughout both phases of a case involving the death penalty. "Such legislative preference for the same jury at both trials deprives the defendant neither of due process nor of the right to an impartial jury. Since all of the evidence properly introduced at the trial on the issue of guilt is relevant in determining the penalty (Pen. Code, § 190.1), having the same jury avoids repetition of evidence and is thus not an arbitrary requirement." (*People* v. *Gilbert, supra,* 63 Cal.2d 690, 712; see also, Report to the Board of Governors of the Committee on Criminal Law and Procedure, 41 State Bar J. 798, 799.) Third and finally, it should be observed that section 1074, as interpreted by us in *Riser,* compels the exclusion of all prospective jurors whose "conscientious opinions" would prevent the proper exercise of the discretion contemplated by section 190. This certainly means that challenges for cause pursuant to section 1074 should be granted where it is made to appear that a prospective juror's predisposition *in favor of* the death penalty would prevent his voting for life imprisonment in a proper case. It is therefore difficult to see how either the prosecution or the defense could be favored by a proper administration of section 1074 of the Penal Code. (See *People* v. *Gilbert, supra,* 63 Cal.2d 690, 712.)

Defendants contend that the trial court erroneously excluded evidence offered to prove that Juan Baca Lujano, one of the Ontiveros group, had a reputation for turbulence and violent conduct.[11] The offer of proof was that Joseph

[10]See Oberer, *Jury Selection, The Death Penalty, and Fair Trial,* 71 Case & Comment, no. 4, p. 3; Adorno et al., The Authoritarian Personality (1950).

[11]During the earlier cross-examination of Lujano, the defense had sought to establish that he had been convicted of misdemeanor assault offenses in 1947 and 1958, but the prosecutor's objection to this line of questioning was properly sustained.

Bucci, a Ventura County probation officer, would testify that he, in the performance of his official duties, had in 1958 (the date of a misdemeanor assault conviction of Lujano) conducted an inquiry into Lujano's reputation for violence, and had then made the determination, based upon conversations with 20 or 25 people in Lujano's community, that Lujano's reputation was that of ''an assaultive type person . . . aggressive, especially when he was drinking.'' The offer was rejected (1) because it was too remote to have significant probative value as to present character, and (2) because reputation can be shown only through persons living in the community and having direct knowledge of such reputation.

It is argued that the proffered evidence was clearly relevant to the issues herein because it was the defense theory that the death of Jesus Ontiveros resulted from blows struck in self-defense against the aggression of Ontiveros and his companions. Defendants therefore rely upon the well-known rule that when evidence of self-defense has been produced ''the accused may introduce evidence of the reputation of the deceased for turbulence and violence.'' (McCormick, Evidence (1954) § 160, p. 339; see *People* v. *Davis* (1965) 63 Cal.2d 648, 656 [47 Cal.Rptr. 801, 408 P.2d 129]; *People* v. *Yokum* (1956) 145 Cal.App.2d 245, 259 [302 P.2d 406].) However, even assuming that a rational extension of this rule would permit the introduction of reputation evidence as to one not the deceased, and further assuming that, as defendants argue, a determination of reputation by one whose duties require objectivity of him is at least as reliable as an assessment made by a member of the community—still defendants offer no argument against the trial court's determination, in the exercise of its discretion, that evidence relating to Lujano's reputation *seven years before* the acts in question was too remote to have present probative value. It is significant that the court, at the time it sustained the prosecution's objection, told defendants that if they could produce a witness ''who would testify as to the reputation in the community of Mr. Lujano within a time much more recent as to the events we are concerned with, a very different approach would be taken by the Court.'' However, no other witnesses as to Lujano's reputation were produced by the defense. We find no error in the ruling.

Defendants' final contention meriting present discussion concerns the cross-examination by the prosecution of a witness produced by the defense for the purpose of showing the bad reputation of Bobby Joe Barkley for truth, honesty,

and integrity. As noted above, two teachers at Barkley's school, Robert Yonker and Nicholas Wilson, testified that Barkley had a bad reputation for truth, honesty, and integrity—and that they would not believe him under oath. During cross-examination Yonker was asked, over strong objection, whether he had discussed Barkley's reputation with each of three specifically named other teachers at the school, and whether each of them had expressed to him an assessment of Barkley's reputation at variance with that expressed by Yonker on direct examination.[12] None of the named teachers was subsequently called by the prosecution.

In the case of *People* v. *Eli* (1967) *ante*, p. 63 [56 Cal. Rptr. 916, 424 P.2d 356], we very recently observed that when a defendant, through the testimony of independent witnesses, places in issue his reputation in the community as to a certain character trait or traits, a scrupulous exercise of discretion is required of the trial court in order to prevent "cross-examination based upon mere fantasy" in the form of questions testing the witness' favorable assessment of defendant's reputation through reference to alleged events which either have no basis in fact or have no relevance to the inquiry in question, to wit, reputation. We there indicated that such cross-examination may best be prevented "by first ascertaining, *outside the presence of the jury,* 'that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation.'" (*People* v. *Eli, supra, ante,* pp. 63, 79; see *Michelson* v. *United States* (1948) 335 U.S. 469, 481 [93 L.Ed. 168, 176, 69 S.Ct. 213]; Witkin, Cal. Evidence (2d ed. 1966) § 1214, pp. 1121-1123; 3 Wigmore, Evidence (3d ed. 1940) § 988, pp. 617-624; McCormick, Evidence, *op. cit.,* § 158, p. 337.) We held that under the facts there at bench, where at least two of the specific events raised in cross-examination were not such that they could have caused general community comment, the court's failure to utilize the indicated procedure constituted an abuse of discretion, though not one which under the circumstances of that case resulted in a miscarriage

---

[12]The following is an example of the kind of inquiry here involved:

"Q. Now, did you discuss [Barkley's] reputation for honesty and integrity with Coach Craig?

"A. Yes, I have.

". . . . . . . . . . .

"Q. Isn't it true that Coach Craig told you that whenever Bobby Joe was confronted with facts, he would admit his part in any affair?

"A. I don't recall any such statement of Coach Craig."

of justice. (*People* v. *Eli, supra, ante,* pp. 63, 79.)

The facts of the instant case raise an issue closely related to that considered in *Eli.* There are, however, several obvious factual differences. Here it is not the defendant's reputation which is in issue; rather it is the reputation of the chief witness for the prosecution. Secondly, the reputation witness here testifies to the *bad* reputation of the person in question, rather than to his good reputation. Thirdly, the character trait as to which the reputation evidence is given does not relate to a propensity to commit an overt act; rather it relates to the question whether the person whose reputation is in issue has told the truth in court. Finally, the questions asked on cross-examination do not seek to alter the expressed assessment of reputation through raising the implication that certain acts of the person whose reputation is in issue are inconsistent with that assessment; rather they seek to challenge the accuracy of the assessment through raising the implication that other persons qualified to assess reputation have communicated to the reputation witness assessments at variance with that expressed by him.

These differences do not render inapplicable the *Eli* principle. One of the dangers sought to be minimized by *Eli* was that of the question, based upon a paucity or a total lack of factual support, which is asked with little or no hope of affirmative response and with the basic purpose of creating through innuendo that which cannot be established by proof. (Cf. *Michelson* v. *United States, supra,* 335 U.S. 469, 481, 93 L.Ed. 168, 176; 3 Wigmore, *op. cit.,* at p. 624; McCormick, *op. cit.,* at p. 336.) That danger is present in circumstances such as those before us. Certainly, the denials of Mr. Yonker did little to dispel the impression that other persons as well qualified as he to judge Barkley's reputation entertained very different views of that reputation—and had told him so. This may well have been the case, but the defendants, through their proper and timely objection, were entitled to have the fact ascertained out of the presence of the jury before it was used as a basis for cross-examination.

The judgments are reversed.

Traynor, C. J., Peters, J., Tobriner, J, and Burke, J., concurred.

MOSK, J.—I concur in the judgment, and generally in the opinion. However, on the issue of the retroactive application of *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353,

407 P.2d 265], I concur only under compulsion of the majority opinion in *People* v. *Charles* (1967) *ante,* p. 330 [57 Cal. Rptr. 145, 425 P.2d 545]. (See my concurring opinion in that case, *ante,* p. 345.)

McCOMB, J.—I dissent. I would affirm the judgments. In my opinion, the alleged errors have not resulted in a miscarriage of justice. (See Cal. Const., art. VI, § 13.█)

Respondent's petition for a rehearing was denied June 14, 1967, and the opinion was modified to read as printed above. McComb, J., was of the opinion that the petition should be granted.