[Crim. No. 4542.    Third Dist.    June 11, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM RALPH SPANIEL, Defendant and Appellant.

Lionel K. Hvolboll, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws, Jack R. Winkler and Robert J. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, J.*—Defendant appeals from conviction, after a jury trial, of kidnaping for the purpose of robbery and of robbery by force and violence and sentence of life imprisonment without possibility of parole on the kidnaping charge alone after penalty trial by the court, jury having been waived.

## CONTENTIONS

1. Evidence sufficient to show that the kidnaping was for the purpose of robbery and that defendant was able to form intent.

2. Defendant's proposed instruction on specific intent due to use of LSD was covered by other instructions.

3. No prejudicial misconduct of prosecutor.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

4. Section 209 of the Penal Code, kidnaping for purposes of robbery, is constitutional.

5. No error in excluding jurors opposed to the death penalty.

6. Death penalty as cruel and unusual punishment not involved.

7. No evidence of incompetence of trial counsel.

8. Defendant's statements made prior to amended charge admissible.

9. Defendant physically and mentally able to stand trial.

10. Robbery conviction should not be reversed.

### RECORD

Defendant was originally booked on the charge of attempted murder. Thereafter he was indicted, count One, for violation of section 209 of the Penal Code, kidnaping for the purpose of robbery, and count Two, violation of section 211 of the Penal Code, robbery. His motion under section 995 of the Penal Code, for dismissal of count One, was denied. At the jury trial defendant was convicted of both offenses. He waived a jury trial on the penalty, and after fixing the penalty for the kidnaping offense at life imprisonment without possibility of parole the court sentenced him to state prison on the kidnaping conviction and suspended sentence of the robbery conviction pursuant to section 654 of the Penal Code. Defendant's motion for new trial was denied.

### EVIDENCE

On December 6, 1966, about 11 p.m., Robert Cline entered the Shadowbrook Lounge. He met some friends and had a drink with them. About 12:45 a.m. he became tired and at the suggestion of the bartender went to his car in the adjacent parking lot and lay down in the front seat to take a nap. Defendant, who was looking for a car to steal, observed Cline asleep in the car. He then decided to hit Cline over the head with a ratchet handle he found in a parked pickup and steal Cline's car. After waiting about 45 minutes for the area to clear, he opened the door of Cline's car and hit Cline several times on the head with the ratchet handle. Cline bled profusely. Defendant removed Cline's wallet and watch from his person, slid into the driver's seat, started the car and drove off. Defendant drove aimlessly through the north area of Sacramento until he came to Sunset Avenue, outside Fair Oaks. There he pulled off the highway onto a dirt road and

stopped. He rolled Cline out of the car, bound his hands behind his back with his belt and removed his shoes and trousers. Cline managed to free his hands, quickly arose and ran up a levee into the bushes. Defendant did not pursue him but instead drove off in Cline's car. Cline hid until he thought it safe to seek help and then made his way to the highway. He flagged down an oncoming car which turned out to be his own with defendant at the wheel.

Defendant again struck Cline with the ratchet handle and forced him back in the car and drove off. Cline was able to escape from the car and went to a deserted shopping center to seek help. Defendant followed Cline, beat him to the ground and dragged his body across the street and into some bushes.

About this time Deputy Sheriff Packard was on patrol. His suspicions were aroused when he saw defendant appear in view and then jump into some bushes beside the road. Stopping his car, Packard gave chase. When defendant saw the officer, he turned about, walked up to the officer and said, "You got me, I give up." As they neared the patrol car, defendant dropped a rubber glove and kicked it under the car. Defendant's pants, shoes and hands were covered with blood. When asked about the blood, defendant explained that there had been an accident, indicated a station wagon parked near the area and said he had hurt his head. Unable to see any injury to defendant, Packard placed him in the patrol car. As defendant entered the car a wristwatch dropped off his right arm. Packard then noticed that defendant was wearing a wristwatch on his left arm.

In the patrol car calling for assistance, Packard noticed what appeared to be blood on the sidewalk. Following the trail of blood marks into the bushes, the officer found the victim Cline stripped of his trousers, shoes and socks, unconscious and badly injured about his head. Alongside Cline was a bloody ratchet handle.

Cline, after recovering from a depressed skull fracture received as a result of being struck many times with the ratchet handle, was able to recall only a few details of the event. He did not recall being in the Shadowbrook Lounge but did recall lying on the front seat of his car with his head against the door on the passenger side and his wristwatch being removed. Although he recalled his head hurting, he could not remember being hit. He recalled a man he recognized as defendant being behind the wheel of the car, who stated that he might have to kill him. Cline recalled lying on

damp, pebbly ground with his hands bound by his belt and his trousers and shoes removed, getting up and running until he reached an asphalt road where he flagged down a car and saw that the driver was defendant. He recalled nothing more after he started running again.

At the hospital where defendant was taken for a physical examination and blood test defendant asked how the victim was. When informed that he was still alive, defendant said, "He's not dead? He sure has a hard head."

After properly being advised of his constitutional rights, defendant made statements which, except for minor discrepancies, were substantially as testified to by him at the trial. He was 26 years of age and had had two years of college. On the 2d or 3d of December 1966 he left Los Angeles with a friend and hitchhiked (later testifying that they drove in a stolen car) to San Francisco to see his mother who lived in Sausalito. Upon arriving he discovered that she was out of town but would be returning on December 6. On the 6th, with three others, defendant started to the airport to meet his mother, but anticipating an emotional scene with his mother because of his uncle's death they went to Berkeley where he got some LSD-25.

This meeting with his mother was not warm; she wanted to know what he was going to do with himself, so he and two of his friends decided to drive to Denver.

Defendant had begun to feel the effects of the LSD at the airport, and he had begun hallucinating on the trip towards Sacramento; he was "grooving" on the traffic, the radio and the people; it was a "good trip" or "groovy," i.e., it was worth the money for the LSD.

When they arrived in Sacramento they stopped at a service station in the north area near where the defendant had once lived (for 3 months); he got out to meditate, to think, to relive the events that happened during that time. While there he gave a woman at the station a fur coat that he had gotten from a burglary he committed in Mill Valley. Defendant returned to the car. They started off but defendant wanted to get out again; when he did he saw a patrol car, so he ducked into a passageway between some buildings; upon returning the car and his friends were gone. Defendant panicked, he "flipped" or "freaked out"; he got this intense feeling of being abandoned again, first by his family and now by his friends; it brought on a strong feeling of insecurity.

Defendant just walked around, he did not know what he

was doing, when suddenly he got "this brilliant idea that I was going to take a car," go after his friends, get his clothes and money and return to Sausalito.

Defendant looked around for an unlocked car; he saw Cline's car parked in the lot with Cline lying on the front seat with his head near the door on the right or passenger side; defendant looked around the area for something with which to stun Cline. He found a ratchet handle from a pickup truck, waited until the bar closed and then struck Cline twice on the head. At the sight of the blood defendant panicked again; his "freak out" became a nightmare; he was babbling and talking to himself while he removed Cline's wristwatch and went through Cline's pockets looking for money and the car keys. After Cline told him the keys were in the ignition, defendant got in and started driving aimlessly, looking for a hospital. When he drove off, he had no other intent than to find a hospital. When near the area of Sunrise and Fair Oaks Boulevard, defendant stopped the car, bound Cline's hands behind his back with his belt; he then drove off onto a dirt road near Perdetta Lane, "gently" pulled Cline out of the car and removed his shoes and trousers to slow him down so that he (defendant) could get away with the car.

After returning to the car defendant sat there going through Cline's wallet; Cline jumped up and ran off. Defendant cruised around the area looking for Cline so that he could take him to the hospital. When defendant saw Cline by the side of the road, defendant entertained the idea of running him down but because he was a "non-violent man" he stopped to persuade Cline to get into the car so he could be taken to the hospital. Defendant pleaded with Cline to get into the car, but when Cline refused defendant, realizing Cline needed help, hit him with his fist twice. When this did not faze Cline, defendant got the ratchet handle and hit him several times on the head to stun him.

After getting Cline into the car, defendant started driving around again, looking for a hospital, knowing that Cline needed help. In the vicinity of San Juan and Fair Oaks Boulevard, after defendant had lit a cigarette, he gave the book of matches to Cline to light his cigarette. Cline, instead, lit the whole book and threw them at defendant. Defendant slammed on the brakes and Cline jumped out of the car; defendant jumped out after Cline to get Cline back into the car to take him to the hospital. Defendant, however, had to return to the car to back it away from the telephone pole it had rolled into and park it; pocketing the keys, defendant

then went after Cline again. When he found Cline he struck him on the side of the neck, causing Cline to fall; defendant then dragged Cline some 75 feet into some bushes. No longer needing the ratchet handle, defendant tossed that into the bushes. Defendant could not explain why he dragged Cline into the bushes other than so he could go get help for Cline.

As defendant was leaving the bushes, he saw the police car and was much relieved, for now he could get help for Cline. Officer Packard put him into the patrol car, however, before defendant could tell him about Cline.

Defendant could not explain these acts of violence; all he wanted was Cline's car and money for gas, which is all right according to his moral code that a person can do anything he wants so long as he does not hurt man. However, when under the influence of LSD a person does things for which he can give no explanation; for example, he could not explain why he was carrying under his belt rubber gloves which he had stolen in Mill Valley (while not under the influence of LSD) to replace the surgical-type gloves he had been using.

Defendant's defense was based upon his claim of lack of intent to commit either crime and his diminished capacity to form an intent. The jury on ample evidence rejected this defense.

1. Kidnaping for robbery.

Defendant argues that taking the victim's watch was a robbery and then driving off was a kidnaping but that the two offenses were separate and distinct, and therefore the kidnaping was not for the purpose of robbery within the meaning of section 209 of the Penal Code.

Defendant overlooks the fact that his primary objective was to steal the car, the stealing of the watch being merely incidental. He accomplished the acts of the taking of the car and the kidnaping of the victim by the same act of driving the car away with the helpless victim inside. Additionally, ''where a kidnaping occurs after the actual perpetration of a robbery such kidnaping may be kidnaping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber or to remove the victim to another place where he might less easily sound an alarm.'' (*People* v. *Monk* (1961) 56 Cal.2d 288, 295 [14 Cal.Rptr. 633, 363 P.2d 865].) The fact that defendant did not keep possession of the stolen car does not change the nature of the crime. (See *People* v. *Zurica* (1964) 225 Cal. App.2d 25, 32 [37 Cal.Rptr. 118].) The evidence clearly shows

that both as to the robbery of the watch and of the car defendant used the car to effect his escape and remove the victim to a place where he might less easily sound an alarm, at which place he removed Cline's pants and shoes so, as defendant testified, Cline could not give chase.

2. Instruction on specific intent.

Defendant next contends that it was error for the court to have refused to give his proposed instruction that specific intent is a necessary element to be guilty of a violation of section 209; that "If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant has such specific intent.

"This rule applies to intoxication from any cause, and includes that intoxication which can be caused by use of the drug commonly known as LSD." (CALJIC No. 78-B, revised, as modified by defendant.)

This instruction was not given on the basis that it was covered by defendant's proposed instruction on diminished capacity which was given: "When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, *however caused,* which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged." (CALJIC No. 73-B, revised; italics added.)

The court instructed on the specific intent required in the commission of the crimes charged.

Defendant argues that giving this instruction in conjunction with CALJIC No. 73, which instructed the jury that it must assume defendant was sane at the time of his alleged conduct, without giving CALJIC No. 78-B, as modified by him, was erroneous in that the jury could be misled into believing "abnormal mental" condition meant a form of insanity and not diminished capacity because of the influence of the drug LSD.

Prior to the Wells-Gorshen doctrine on diminished capacity the defense of intoxication as provided in Penal Code section 22 had limited application. To be relieved of responsibility for the commission of an offense on the ground of voluntary intoxication, it was necessary to prove that the brain had

become permanently affected. (*People* v. *Lim Dum Dong* (1938) 26 Cal.App.2d 135, 138 [78 P.2d 1026].) Intoxication could also be considered for the purpose of determining the degree of the offense. (*People* v. *Methever* (1901) 132 Cal. 326, 332 [64 P. 481].)

It is now well established that the defense of diminished capacity as a result of voluntary intoxication or drugs is relevant to prove defendant was incapable of forming the specific intent to commit the crime charged. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 316-319 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Anderson* (1966) 63 Cal.2d 351, 364-366 [51 Cal.Rptr. 238, 414 P.2d 366]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677].)

Defendant was entitled to an instruction that he was relying upon the defense of diminished capacity. This instruction was given. This instruction, CALJIC No. 73-B, offered by defendant properly charged the jury on the defense of diminished capacity as it covers abnormal mental or physical condition, *no matter how caused.*

When a jury is fully and fairly instructed on a subject, the court may, as here, properly refuse defendant's proposed instruction which has been covered by other instructions. "A party may not complain that the court did not instruct in his phraseology if the court has otherwise correctly instructed upon the subject." (*People* v. *Magee* (1963) 217 Cal.App.2d 443, 468-469 [31 Cal.Rptr. 658].)

It is unlikely, as contended by defendant, that the jury was misled by the instructions because in addition to the instruction on diminished capacity the court also gave CALJIC No. 73, based upon section 21 of the Penal Code which stated the jury must presume the defendant was sane at the time of his conduct in question. Defendant did not plead not guilty by reason of insanity so his sanity could not be an issue at the trial. The court was therefore required to instruct as it did in CALJIC No. 73.

The court stated to defense counsel during the penalty hearing that the latter had made it clear to the jury that lack of specific intent and diminished capacity were defendant's defense. "You certainly went over it and over it, and over it, not once, but time and time again."

Reading CALJIC No. 73 and No. 73-B, revised, together, it clearly appears that although defendant must be considered sane, the jury could determine whether he was suffering from any abnormal or physical condition, *however caused,* which might have prevented him from forming the specific intent

which the court had previously instructed was essential to constitute the crimes charged.

3. Alleged misconduct.

■ Defendant admitted one prior conviction. Out of the presence of the jury defendant was asked if he had not been convicted of violation of a certain New York statute for possession of marijuana. Defendant then replied that such violation was merely a misdemeanor. After a colloquy between court and counsel this line of questioning was dropped. Had this questioning been done before the jury, it would have been erroneous. However, as the jury knew nothing about it and the court stated that it would not consider this conviction as a prior felony conviction, the questioning was completely harmless.

■ 4. Section 209 of the Penal Code, kidnaping for purposes of robbery, is constitutional.

Defendant contends that section 209 is based on the federal kidnaping statute, 18 U.S.C. section 1201, subdivision (a), the portion of which dealing with the death penalty was held unconstitutional in *United States* v. *Jackson* (1968) 390 U.S. 570 [20 L.Ed.2d 138, 88 S.Ct. 1209], and that therefore section 209 also must be unconstitutional. However, there is a great difference between that section and the federal statute. The latter provides in effect that only the jury can prescribe the death penalty. This practically forces a defendant to waive his right to a jury trial where he might be given the death penalty and to seek a trial by a judge who could not impose that penalty. Under section 209 as construed by our Supreme Court in *People* v. *Langdon* (1959) 52 Cal.2d 425, 433 [431 P.2d 303], and *People* v. *Golston* (1962) 58 Cal.2d 535, 538 [25 Cal.Rptr. 83, 375 P.2d 51], and as stated in section 190.1 of the Penal Code, there is no such distinction between the jury and the judge. Either can impose the death penalty.

5. Excluding jurors.

■ Defendant asserts that six prospective jurors were erroneously excluded because of conscientious scruples against the death penalty.[1] The record shows that six jurors were excused by stipulation. Defendant moved to augment the record to include the proceedings on selection of the jury. The motion was denied because of failure to comply with procedural requirements.

---

[1]Apparently this is his reason for their exclusion. He does not definitely give any reason.

Moreover, assuming that the jurors were excused because of their conscientious scruples and that in spite of defendant's stipulating to their being excused he can question the reason for their being excused, it is well established that there is no error in excluding jurors opposed to the death penalty if their opinions preclude finding the defendant guilty. (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 497-498 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Riser* (1956) 47 Cal.2d 566, 573-576 [305 P.2d 1]; see Pen. Code, § 1074, subd. 8.)

6. Death penalty not involved.

▉ Defendant contends that the death penalty constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Since he did not receive that penalty, he may not challenge its constitutionality. ''The rule is well established, however, that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself. . . .'' (*In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

7. Competence of trial counsel.

Defendant has asked his court-appointed counsel on this appeal to raise the issue of the competency of his court-appointed counsel. Defendant has failed to designate any instance of incompetency of said counsel. An examination of the record also fails to disclose any such instance.

8. Defendant's statements.

▉ Defendant now contends that because the only charge pending against him at the time he made four separate statements was that on which he was booked, attempted murder, he was making the statements believing that he would have to answer for that offense only, and hence the statements should not have been admitted at the trial of the more serious offenses. He concedes that he ''freely and willingly gave the statements in answer to the questions propounded,'' and makes no contention that the rules of *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and the other rules dealing with statements were violated. Although he was told that he was booked for attempted murder, no one informed him that his statements would be used *only* in connection with the charge booked. He contends

also that at the times of the various statements he was so under the influence of LSD that he could not understand his constitutional rights as stated to him.

At the trial there was an exhaustive *voir dire* to determine whether his statements were admissible, that there was a compliance with *Miranda* and the other rules and an intelligent and knowledgeable waiver of his rights.

The following were the circumstances of his making the statements.

He was advised of his constitutional rights at least four times. The first time was while he was sitting in the patrol car just prior to being transported to the station. At this time he stated, "I'm aware of my rights, I'll sign the paper if you give me a cigarette." Officer Packard, not having a cigarette, did not offer the printed *Miranda* card to defendant for him to sign. When defendant was in the jail lobby, he was again advised of his constitutional rights. Sometime in the interval defendant obtained a cigarette, and seeing Officer Packard he volunteered to sign the card.

After defendant had showered he was taken to the hospital, and while there he told Officer Saulter that if he (Officer Saulter) would answer one of his (defendant's) questions, defendant would answer one of Officer Saulter's. Defendant then asked how Mr. Cline was. When told Cline was still living, defendant responded that he would answer a question and then identified himself as Spaniel. (Prior to this time he had given "Cline" as his name.)

On December 7 at 7:43 a.m., just prior to his first interrogation, he was again advised of his constitutional rights and again signed a card. At this time he was told that he was being charged with attempted murder; until defendant made this statement the officers did not know that there had been a violation of section 209 (kidnaping).

Officer Saulter was of the opinion that defendant was not under the influence of either alcohol or drugs; defendant was very alert; and while at the hospital with Officer Saulter defendant made a few joking remarks.

After this preliminary statement he was advised that he was being charged and was thereafter booked for the kidnaping violation. Defendant was then questioned on December 8 after again being advised of his constitutional rights. Officer Drennon was also of the opinion that defendant was neither under the influence of alcohol nor drugs; defendant appeared normal; he did not appear to be sleepy, and his demeanor was calm.

Prior to his second statement, the officers learned of the kidnping and then informed defendant that he was being charged with the kidnaping offense. He then again detailed the facts of the kidnaping. Apparently defendant had "the compulsion to confess" and to exonerate himself of any criminal intent. (See *People* v. *Ditson* (1962) 57 Cal.2d 415, 435 [20 Cal.Rptr. 165, 369 P.2d 714].)

After listening to defendant's claim that he was still under the influence of LSD when he made the statements, the court ruled that he fully understood his constitutional rights, answering the questions fully aware of those rights. There is nothing to substantiate his claim that he would not have talked had he known that he would be charged with kidnaping. As stated, he knew that fact before he made the second and following statements.

9. Defendant physically and mentally able to stand trial.

■ Defendant now contends that during his trial, because of his prior use of LSD, he did not have the mental capacity to stand trial. Other than his present unsupported statement to that effect, there is nothing to indicate a lack of such capacity. It is true that his trial was interrupted from March 29 until April 10, 1967, because defendant attempted to commit suicide and was taken to the hospital, remaining therein until about the later date. The jury's verdict was received April 13. The case was then continued to April 17 for trial as to the penalty on the kidnaping trial.

On the latter date, defendant's counsel complained to the court that defendant refused to discuss with him the matter of waiving the jury on the penalty hearing. Apparently the court had informed counsel that if defendant would waive the jury for that hearing the court would not impose the death penalty. After the court had reminded defendant of the seriousness of the pending hearing and told him that he should cooperate with his counsel, a recess was taken to enable defendant and counsel to confer. After such conference, defendant waived a jury hearing, which waiver was joined in by counsel.

No suggestion was made to the court that defendant did not have the mental capacity to have stood the trial or to stand the hearing. At the trial his answers were responsive, clear and concise. More than four months had elapsed since the last time he claimed to have taken LSD. Defendant's testimony covers approximately 168 pages of the reporter's transcript, during which he seemed to have no difficulty in understanding

and answering the questions put to him by the prosecutor and his own counsel. Except for the time when he at first declined to accept his counsel's advice that he waive a jury hearing on the penalty, he appears to have cooperated with his counsel, and even then, after a short consultation with counsel, he cooperated.

Defendant now contends that he was in a Virginia mental hospital for approximately two months in 1961 and in Napa State Hospital for about a week in 1963 or 1964, and that his prison physician told him that he had scars on his brain because of the March 29, 1967, suicide attempt. None of this appears in the record. The trial judge, however, as he stated on the penalty hearing, had the opportunity to observe defendant throughout the trial. The judge stated that throughout the proceedings, as well as throughout his activities, defendant showed "some ambivalence" (simultaneous action toward and repulsion from an object, person or action). The judge apparently saw no indication of any incapacity of defendant to participate in the trial. Even when asked if he had any cause to show why judgment should not be pronounced, defendant made no contention of lack of mental capacity to stand trial.

10. The sentence.

As stated, defendant was convicted of both violation of section 209 of the Penal Code (kidnaping for purpose of robbery) and violation of section 211 of the Penal Code (robbery). The court fixed the penalty on the kidnaping charge at life imprisonment without possibility of parole and sentenced him on the robbery charge to state prison but "It Is Further Ordered that sentence be and the same hereby is suspended as to Count Two only as being part of a continuous and nondivisible transaction as provided in Section 654 of the Penal Code."[2]

Defendant contends that instead of suspending sentence on the robbery conviction the court should have set aside such conviction.

There seems to have been some confusion concerning the application of section 654. In *People* v. *Knowles* (1950) 35 Cal.2d 175 [217 P.2d 1], the court, after holding that section 654 applied where the defendant's convictions for violation of

---

[2]That section provides in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one. . . ."

section 209 (kidnaping) and section 211 (robbery) of the Penal Code both rested upon the commission of a single act and therefore the defendant could be punished only for the commission of one of the offenses; and as the penalty prescribed for violation of section 209 is greater than that for violation of section 211, the defendant should be punished for the kidnaping conviction only. Although the opinion only discusses penalties, the order made by the court was that the kidnaping conviction should be affirmed and the robbery *conviction* reversed. Based upon that result in *Knowles* the court of appeal in *People* v. *Darcy* (1951) 101 Cal.App.2d 665 [226 P.2d 53]; *People* v. *Thwaits* (1951) 101 Cal.App.2d 674 [226 P.2d 58]; and *People* v. *Kennedy* (1951) 101 Cal.App.2d 709 [226 P.2d 359], reversed *convictions* for robbery and affirmed convictions for kidnaping.

In *In re Wright* (1967) 65 Cal.2d 650 [56 Cal.Rptr. 110, 422 P.2d 998], the defendants were convicted of both kidnaping for purpose of robbery and robbery. The court reviewed a number of cases dealing with multiple convictions and reaffirmed the rule that section 654 applies to multiple convictions resting upon the commission of a single act. The court then stated (p. 653): "Section 654 forbids multiple punishment by imposition of the proscribed multiple sentences, but not multiple convictions." The court turned to the question of the proper procedure to be followed in this type of multiple sentences, saying, "The Attorney General further states that our decisions are in conflict as to the proper procedure to be followed by appellate courts to correct multiple sentences violative of section 654. He urges that if we refuse to uphold the sentences here on either ground advanced by him (that concurrent sentences do not inflict double punishment or that they are not prejudicial) then we should suspend execution of one sentence by a procedure similar to that of the sentencing court approved in *People* v. *Niles, supra,* 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11]. Since *People* v. *McFarland, supra,* 58 Cal.2d 748, 763 [26 Cal.Rptr. 473, 376 P.2d 449], however, it has been settled that the appropriate procedure at the appellate level is to *eliminate the effect of the judgment* as to the less severely punishable offense *insofar as penalty alone is concerned.*" (Pp. 655-656, italics added.)

The court then held that as to each defendant the sentence for "robbery should be eliminated because it is less severe than that for the kidnapping" (p. 656) and set aside the robbery sentence.

894

In a footnote to *Wright*, page 656, the court said, concerning *Niles* procedure (there the trial court sentences upon both convictions but granted a stay of execution of the sentence on the offense with the lighter penalty pending appeal and service of sentence on the more serious offense, such stay to become permanent when that sentence was completed) : "Although the Legislature has not expressly provided for a stay of execution of sentence in the *Niles* situation, the power to proceed as the trial court did in that case is within the fair import of section 654. As the appellate court there explained (227 Cal.App.2d at 756) that procedure reasonably reconciles the policies involved in applying section 654 to protect the rights of both the state and the defendant."[3]

In the case at bench the trial court's order was that the robbery sentence be suspended. Although this order was not exactly in the terms of either *Niles* or *Wright*, its intent clearly was the same as the intent in those cases, namely, that as long as the sentence on the major crime existed or was being served the sentence on the minor crime was set aside,

[3]The explanation of the appellate court in *Niles* referred to by the Supreme Court in the above quotation is interesting. In *People* v. *Niles*, 227 Cal.App.2d 749, 756 [39 Cal.Rptr. 11], the court first quoted from *People* v. *McFarland*, 58 Cal.2d 748, 763 [26 Cal.Rptr. 473, 376 P.2d 449], as follows, " '. . . *The appropriate procedure, therefore, is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned* . . .' ", and then said: "It is obvious that this rule poses real problems for a trial court at the time of sentence. At that time, the court must take into consideration the fact that its judgment, on either count, might be reversed on appeal. An appellate court may safely reverse the conviction on one count, in order to preclude the possibility that dual judgments might work a disadvantage to the defendant (see *People* v. *Tideman* (1962) 57 Cal.2d 574, 586 [21 Cal.Rptr. 207, 370 P.2d 1007]; *People* v. *McDaniel* (1957) 154 Cal.App.2d 475, 485 [316 P.2d 660]), or, as *People* v. *McFarland, supra* (1962) 58 Cal.2d 748, 763, suggests as a preferable procedure, may reverse the sentence only, leaving the conviction standing. But a trial court is in a different position, if it dismisses the count carrying the lesser penalty, and the conviction on the remaining count should be reversed on appeal, the defendant would stand with no conviction at all. Nor can the trial court safely sentence on one count only, since it would lose jurisdiction after 21 days to sentence on the second count. (Pen. Code, § 1191)—long prior to any possible disposition of an appeal. In *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794], the court approved the imposition of concurrent sentences. But, in light of *People* v. *McFarland, supra*, that procedure is no longer proper. (See also *People* v. *Bailey* (1964) *ante*, p. 440 [38 Cal.Rptr. 718].) It follows that the procedure adopted by the trial court in this case was a reasonable—and so far as we can see the only possible—reconciliation of the various policies involved. Any other method either incurs the risk of letting a defendant escape altogether, or else imposes an unnecessary burden on an appellate court and on the trial court on the inevitable remand for correction of sentence. The procedure here affords appellant the maximum protection to which section 654 entitles him and, under no condition, can operate to his prejudice."

but if for any reason the judgment on the major crime is set aside (a possibility which, in view of the recent expansion by the courts or reviews under *coram nobis* and habeas corpus, is always possible), the sentence on the minor crime takes effect. In other words, the suspension of the sentence on the robbery conviction shall remain effective unless or until the conviction on the kidnaping is set aside, then on proper proceedings the suspension of the sentence on the minor crime, the robbery, could be terminated and that sentence would then become effective.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied July 10, 1968, and appellant's petition for a hearing by the Supreme Court was denied August 8, 1968.