Filed 7/30/15  P. v. Baymiller CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C070889 |
| Plaintiff and Respondent, | (Super. Ct. No. NCR74998) |
| v. | |
| WILLIAM HOLT BAYMILLER, | |
| Defendant and Appellant. | |

Defendant William Holt Baymiller appeals the trial court's finding that he was legally sane at the time he killed his father.  (Pen. Code, § 1026; unless otherwise stated, statutory references that follow are to the Penal Code.)  He contends the trial court erred to his prejudice by admitting a psychological report addressed to his competency to stand trial, rather than his sanity; and, that the prosecution failed to meet its burden to establish he was insane at the time of the crime solely because of the voluntary ingestion of drugs. We affirm the judgment.

1

Defendant was charged with the murder of his father in violation of section 187, subdivision (a) along with a special allegation that he personally and intentionally discharged a firearm resulting in great bodily injury in violation of section 12022.53, subdivision (b).

Having pleaded not guilty and not guilty by reason of insanity, he later withdrew his not guilty plea and the court, then having before it only defendant's not guilty by reason of insanity plea, declared that the guilt of the defendant to the charges had been established.

Prior to trial on defendant's plea of not guilty by reason of insanity, he waived his right to a jury trial.

The matter proceeded to a court trial and the court found that defendant did not prove by a preponderance of the evidence that he was insane at the time he killed his father and, thus, found defendant guilty as charged. Defendant was sentenced to 15 years to life plus 10 years.

The parties stipulated to the following facts which were set forth in the Tehama County Sheriff's Department's report of the incident.

On the afternoon of September 4, 2008, defendant shot and killed his 89-year-old father. Defendant then drove to a neighbor's house, and told them to call an ambulance because he had just shot his father. He also said, "The Muslims are trying to steal my identity." He added his father was involved in the plot to "do him in." Defendant and his father had had a difficult relationship, and defendant described his father as a "grouchy old man." Defendant admitted he had had a methamphetamine problem for three years, "which is when this whole thing started." Specifically, he started having issues with paranoia when he started using methamphetamine. He denied using methamphetamine the day of the killing, but admitted that he was drinking beer. In a later interview,

2

defendant stated the last time he had used methamphetamine was a few days before the murder.

Defendant's sister reported defendant was "paranoiac and delusional" and had been expressing concerns that Muslims were out to harm him for several years. She also reported he had received treatment at a veteran's hospital for his illness.

The parties submitted the matter regarding defendant's claim to have been legally insane at the time of the killing to the trial court on five psychiatric evaluations. Drs. Busey and Globus prepared reports for defendant. Drs. Caruso, Carlson, and Wilson prepared reports for the People. Wilson's report was prepared in the context of a determination of whether defendant was competent to stand trial. In addition, Ronald Potts, a licensed psychiatric technician who was working at the county jail at the time of defendant's arrest, testified, as well as two of defendant's cousins, Gregory Flick and Ricky Townsend.

Defendant's cousins testified to some of the history of defendant's delusions. Flick testified that in 1998 or 1999, defendant reported someone had stolen his identity. Defendant was still sober at that time. Townsend testified that in approximately 2005, defendant reported thoughts about black "helicopters following him and Muslims looking for him." Defendant continued to write letters indicating he was afraid he would be killed in prison.

Potts diagnosed defendant as a paranoid schizophrenic and concluded defendant's beliefs about Muslims and identify theft were part of a deeply held delusion. He was unaware of defendant's history of methamphetamine abuse. Knowledge of defendant's drug abuse would have affected his diagnoses. Potts distinguished between the delusions of mental illness and methamphetamine and thought defendant appeared more consistent with mental illness. The blood sample taken when defendant was arrested did not show methamphetamine in his system.

3

Dr. Caruso examined defendant and reviewed various reports, including statements by defendant's family members. Caruso noted defendant had a significant history of drug abuse, including using methamphetamine in 2004, which is when defendant started to become very paranoid. Defendant indicated he had used methamphetamine two or three times a week in the weeks preceding the killing of his father. Caruso indicated defendant's use of drugs, including methamphetamine, "surely exacerbated the different mental health issues; very likely making some of them permanent." His drug use may have also increased his "vulnerability to experiencing emotional instability and psychotic symptomatology." Caruso noted defendant had had a respectable military record and work history. He also observed defendant was both emotionally and psychologically estranged from his father, who was often abusive to defendant. Defendant had been drinking alcohol and using methamphetamine in the period leading up to the offense. Caruso reported, "methamphetamine can, with one or two uses, easily trigger psychotic episodes" in dual diagnoses patients who are only marginally stable, like defendant.

Caruso believed defendant had a diminished capacity to make rational or appropriate decisions, but there was also significant evidence that part of the motivation in killing his father was "years of mutual antagonism and hostility." Caruso concluded defendant did not think his father could hurt him, and was able to realize what pulling the trigger on the shotgun would do to his father. Furthermore, defendant immediately recognized the nature of his decision, and took responsibility for his actions. He concluded defendant was psychotic at the time of the shooting, but "there are too many variables to consider in this case to allow a forensic examiner such as myself to conclude, with even a substantial amount of confidence, that a Not Guilty and Not Guilty By Reason of Insanity finding would be appropriate." The historically problematic relationship between father and son, the availability of the gun and ammunition, defendant's comfort handling weapons, the mix of medical and psychoactive drugs, and

4

recent methamphetamine use on top of the existing psychotic disorder was a "recipe for disaster." Caruso concluded, "To say that the Psychotic Disorder, in and of itself, was the primary precursor to what eventually happened is no less than an attempt to change the hypothetical into the reality. It is not that such a conclusion is impossible or even improbable; but in this examiner's opinion it would be an inappropriate conclusion in a legal matter such as this one."

Dr. Carlson also examined defendant. Carlson reported that from 2004 to July 2006, defendant used methamphetamine approximately three times per week. The methamphetamine made him paranoid; he saw monsters, believed "people were after" him, and thought people were going to kill him and steal his identity. Defendant slowed his methamphetamine use in July 2006, but it took him six to eight months to start functioning normally again. Carlson concluded defendant was suffering from an amphetamine related psychiatric disorder, with psychotic components. He noted defendant's "suspicious ideation came across as classic, garden variety methamphetamine-induced paranoia." By 2007, defendant's condition had improved and he was no longer worrying about identity theft. This receding paranoia coincided with the recovery period mentioned after he stopped abusing amphetamine and alcohol. Defendant started using methamphetamine again in August 2008. He used it repeatedly in the days before he killed his father, and "really got wired." He again started to experience paranoid ideation, that people were going to kill him, and were trying to steal his identity. Defendant believed his father was part of the plan to kill him and that was why he killed his father.

Carlson noted defendant's history showed a productive work history, with no reported "ongoing metal illness that interfered with his being an effective worker . . . . This likely rules out a longstanding psychotic disorder given to periodic flareups, such as paranoid schizophrenia or bipolar disorder." He had a significant history of substance abuse, and fell "into a pattern of severe paranoid thinking, the subject matter of which

5

was quite typical for stimulant abusers." Over the next year, after abstaining from substance abuse, defendant's paranoid concerns began to subside. They resumed when he started using methamphetamine again in August 2008, shortly before he killed his father.

Carlson concluded, "the evidence is strongly suggestive of [defendant] having an amphetamine-induced delusional experience in and around the time of the commission of the alleged offense. There does not appear to be a history of freestanding paranoid schizophrenia which was operating in tandem with his substance abuse. To the contrary, [defendant] had been recovering from those paranoid thought patterns up until August when he began using once again." Carlson concluded defendant's paranoia "made him incapable of appreciating the true nature and quality of his actions as well as the legal wrongfulness of them. . . . [T]his was induced by methamphetamine abuse and not due to another mental disorder. Therefore, . . . , he was legally sane at the time of the offense."

Dr. Globus examined defendant and reviewed his records. Globus disagreed with the conclusions of Drs. Caruso and Carlson that defendant's psychotic state was a direct result of his amphetamine abuse. He indicated defendant's history of hypothyroidism was significant in the development of his psychosis. He concluded, "While it cannot be said with absolute certainty that a toxic psychosis from the use of amphetamines played no role in leading to the behavior that resulted in his father's death, it can also not be asserted that the long-term psychosis related to a schizophrenic process and/or myxedema madness played no role." He went on to indicate that either defendant's schizophrenia or myxedema madness played a primary role in his psychosis, and while defendant's amphetamine abuse had been established, he did not find it was the etiological basis for his psychosis. Accordingly, Globus concluded defendant qualified as not guilty by reason of insanity.

Dr. Busey examined defendant and reviewed medical reports, including the NGI reports of Drs. Caruso, Carlson, and Globus, and the competency report of Dr. Wilson.

6

Busey concluded, "[I]t cannot be stated definitely that [defendant's] actions are attributable alone and only to a methamphetamine-induced psychotic reaction. There appears to be ample evidence of what's known as a 'dual diagnosis,' that his long-standing psychotic or psychotic-like behavior has origins that are not all, or perhaps even mainly substance induced. Busey noted there were "not enough definitive medical records to adequately form diagnoses . . . . Also, the self-report of the defendant can be a bit suspect since he has had several years to think about, and perhaps, refine his opinions." Busey concluded the preponderance of the evidence pointed to a "dual diagnosis of some sort of psychotic disorder either existing prior to and/or exacerbated by the use of illicit street drugs." He noted Dr. Caruso's conclusion but Busey's opinion was "to follow the reasoning of Dr. Caruso, . . . but to climb the stile just to the other side of the fence and say it is an appropriate conclusion, in a case such as this, to find for the NGI defense."

Dr. Wilson reported in the context of determining whether defendant was competent to stand trial. (§ 1368.) Wilson evaluated defendant, reviewed investigative reports and medical records from 1988 to 2005, and the evaluations of Drs. Caruso, Carlson, and Globus. Wilson disagreed with Globus's diagnosis of schizophrenia and found it "much more likely that [defendant's] development of a psychosis represents a Methamphetamine-Induced Psychotic Disorder." He also disagreed with Globus's conclusion that defendant had "developed a psychosis in the nature of 'myxedema madness' associated with untreated or poorly regulated thyroid disorder." Wilson diagnosed defendant with Methamphetamine-Induced Psychotic Disorder with delusions in partial remission, and amphetamine and alcohol dependence in institutional remission. He noted, based on his evaluation, that while defendant "continue[d] to report and demonstrate[] some residual signs and symptoms of a methamphetamine-induced psychotic disorder with delusions, [he was] relatively free of the more disruptive and debilitating symptoms of that disorder." He also noted aspects of defendant's history

7

"likely created a pre-existing vulnerability for the development of a Methamphetamine-Induced Psychotic Disorder that has become chronic in nature." Wilson acknowledged defendant's symptoms were consistent with a diagnosis of schizophrenia, but found it more likely defendant had methamphetamine induced psychotic disorder, with symptoms mimicking schizophrenia. Wilson concluded defendant was competent to stand trial.

## DISCUSSION

### I

### *Doctor Wilson's Report*

Defendant contends the trial court erred in admitting Dr. Wilson's report on the issue of legal sanity, since the report was prepared on the issue of his competence to stand trial. He argues the admission of the report was prejudicial, as the People advanced the report as their "primary authority" to support the claim that defendant's condition was "entirely drug-related and therefore could not support a legal defense." He claims the trial court also relied on the report and therefore, it is reasonably likely there would have been a different result if the trial court had excluded Wilson's report.

At the sanity trial, the People sought to introduce Wilson's report, along with Caruso and Carlson's reports on defendant's entitlement to a defense of not guilty by reason of insanity. Defendant argued Wilson's report should be excluded because "his brief was strictly confined to PC § 1368 competency." He contended Wilson exceeded the scope of his appointment by offering opinions on defendant's sanity at the time of the offense, an issue unrelated and irrelevant to the section 1368 competency issue. He did not cite any legal authority for his position or make a specific evidentiary objection.

The People could "think of no case law that would support the proposition that a report from an expert should be excluded on the basis that it went beyond what the court asked it to do." The court observed, and defense counsel agreed, the People could have

8

called Wilson to testify as an expert, even if his opinions went beyond the purpose of his examination.

The court noted that Dr. Busey's report mentioned that Wilson exceeded the scope of his appointment in reporting on defendant's competency. Busey had known Wilson for 43 years, had a great deal of respect for Wilson's intelligence and skills, and did not find any problem with his presenting his views on defendant's qualifying for a NGI defense even though it was beyond the determination of competency to stand trial. The trial court denied the motion, finding the People could call Wilson as a witness, and that the issue raised "really has more to do with the weight of the exhibit than to the exhibit itself."

As the parties agree, the legal standards for determining competence to stand trial and legal insanity are different. "A defendant is deemed incompetent to stand trial if he lacks ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him.' " ' ([*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354 [134 L.Ed.2d 498]], quoting *Dusky v. United States* (1960) 362 U.S. 402, 402 [4 L.Ed.2d 824[].)" (*People v. Lightsey* (2012) 54 Cal.4th 668, 690; § 1368.) By contrast, the defense of insanity may be found only " 'when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act [or] of distinguishing right from wrong at the time of the commission of the offense.' (Pen. Code, § 25, subd. (b).)" (*People v. Skinner* (1985) 39 Cal.3d 765, 768.)

"[T]rial courts enjoy a measure of latitude in determining the permissible scope of expert testimony; a ruling on admissibility of such evidence under Evidence Code section 352 is reviewed under an abuse of discretion standard." (*People v. Moore* (2011) 51 Cal.4th 386, 406.) " '[T]he foundational predicate for admission of the expert

9

testimony: will the testimony assist the trier of fact to evaluate the issues it must decide? [Citation.]' (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.)" (*Moore*, at p. 405.)

Defendant contends, "an opinion directed at the wrong issue is similar to an opinion which lacks support in the evidence." It is not. An expert opinion that lacks support in the evidence "is irrelevant and of no help to the jury." (*People v. Xue Vang* (2011) 52 Cal.4th 1038, 1046.) Here, Wilson based his opinions and conclusions on his evaluation of defendant, his review of defendant's medical records, and his review of the reports of Drs. Globus, Caruso, and Carlson, which were themselves admitted at trial. Wilson observed the reports contained "abundant documentation" of defendant's mental condition, specifically the development of a Psychotic Disorder with Delusions, most likely a Methamphetamine Induced Psychotic Disorder. Wilson did not offer an opinion on defendant's legal sanity. He diagnosed defendant, essentially offering an opinion on the nature of defendant's mental illness and whether it was caused by methamphetamine. The opinion was based on evidence in the record, and was likely to be of help to the trier of fact on the issue of defendant's legal sanity. Accordingly, the trial court did not err in finding the report admissible.

Moreover, to the extent the trial court erred, we can discern no prejudice. As trial counsel noted, had the report been excluded, the People could have called Wilson to testify and offer his opinion through live testimony. In addition, Busey, who had known Wilson for 43 years, did not see "any problem" with Wilson offering his observations on defendant's mental state at the time of the offense. The trial court specifically noted Wilson's report was addressed to a different legal question and therefore could be entitled to less weight than the other reports. After comparing the various reports, including their historical background, diagnoses, and reasoning, the trial court found Dr. Globus's thought process and conclusions were not persuasive. Two experts concluded defendant was legally sane at the time he committed the offense. The trial court found Dr. Carlson's report to be the most persuasive on the NGI issue. Dr. Carlson concluded

10

defendant's paranoia was caused by methamphetamine use, and not another mental disorder. Given this record, we cannot find it reasonably probable that the result of the trial court would have been different had Wilson's report been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II

### *The Burden of Proof*

Relying on section 25.5, defendant next contends once he made a prima facie showing that he was not guilty by reason of insanity, the prosecution had the burden of negating the defense by showing voluntary intoxication or drug abuse was the sole cause of the criminal behavior or mental disorder which caused the criminal behavior. We disagree with defendant's reading of the statute.

To establish entitlement to a defense of legal insanity, the defendant must prove by a preponderance of the evidence "that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25.) However, "this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances." (§ 29.8, former § 25.5, added by Stats. 1993-94, 1st Ex. Sess., ch. 10, § 1, renumbered § 29.8 and amended by Stats. 2012, ch. 162, § 120.)

Prior to 1994, it had been long-settled in California that ordinarily voluntary intoxication was not a defense to a crime. However, " 'when insanity is the result of long continued intoxication, it affects responsibility in the same way as insanity which has been produced by any other cause.' " (*People v. Kelly* (1973) 10 Cal.3d 565, 575.) "In other words, your friendly local lush cannot get sloshed, commit a horrendous crime and slip into a state hospital free from criminal sanctions. If an alcoholic wants to use his problem as an escape hatch, he must drink enough to develop a mental disorder that

11

continues when he is stone sober even though the damage is not permanent in the sense it is beyond repair." (*People v. McCarthy* (1980) 110 Cal.App.3d 296, 299; see also, *People v. Goodrum* (1916) 31 Cal.App. 430, 433-34 ["if one, by reason of long–continued indulgence in intoxicants, has reached the stage of chronic alcoholism where the brain is permanently diseased, where the victim is rendered incapable of distinguishing right from wrong, and where permanent general insanity has resulted, then and in such case he is no more legally responsible for his acts than would be the man congenitally insane, or insane from violent injury to the brain"]; *People v. Lim Dum Dong* (1938) 26 Cal.App.2d 135, 138 ["To [be relieved] of responsibility for the commission of an offense on the ground of voluntary intoxication . . . , it [was] necessary to prove that the brain had become permanently affected"]; *People v. Spaniel* (1968) 262 Cal.App.2d 878, 886-887.)

In the wake of the passage of the "three strikes" law, and a concern it would result in an increased number of defendants trying to utilize the insanity defense, the legislature sought to narrow the availability of the insanity defense and prevent potential abuses. (*People v. Robinson* (1999) 72 Cal.App.4th 421, 427 (*Robinson*).) Accordingly, it enacted section 25.5 providing the insanity "defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances." (*Id.* at p. 425.)

Under section 25.5, there is "no exception for brain damage or mental disorders caused solely by one's voluntary substance abuse but which persists after the immediate effects of the intoxicant have dissipated. Rather, it erects an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the substances caused organic damage or a settled mental defect or disorder which persists after the immediate effects of the intoxicant have worn off. In other words, if an alcoholic or drug addict attempts to use his problem as an escape hatch, he will find that section 25.5 has shut and bolted the opening." (*Robinson, supra*,

72 Cal.App.4th at p. 427.) "By enacting this statute, the Legislature expressed its intent that individuals rendered insane solely because of their substance abuse should be treated differently than those afflicted by mental illness through no conscious volitional choice on their part." (*Id.* at p. 428.)

Defendant reads this statute as shifting the burdens of proof, wherein the defendant has the burden of establishing a prima facie case of insanity, which must then be rebutted by the People.

We note first that the available legislative history of the statute does not even give a hint that the Legislature's intent in passing the measure included an intent to place upon the prosecution the burden of proving that defendant's mental condition has been caused solely by substance abuse.

Insanity operates as an affirmative defense to a criminal charge. (*People v. Hernandez* (2000) 22 Cal.4th 512, 522.) At the sanity phase of a trial, there is a rebuttable presumption the defendant was sane when the crime was committed, and it is his burden to prove otherwise by a preponderance of the evidence. (See *In re Dennis* (1959) 51 Cal.2d 666, 673.) "The party claiming that [he] . . . is or was insane has the burden of proof on that issue." (See Evid. Code, § 522.) The burden is on the defendant to establish legal insanity at the time of the offense. Here, section 25.5 clarifies that where defendant's inability to distinguish right from wrong is based *solely* on substance abuse, he has not met his burden. "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) "[T]here can be no insanity defense when the inability to tell right from wrong derived (1) solely from an addiction or abuse of intoxicating substances, or (2) from a mental defect or disorder that itself was caused solely by such addiction or abuse." (*People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1434.) Thus, to be entitled to the insanity defense, it is essential

that defendant's inability to distinguish right from wrong or know the nature and quality of the act he was committing was not caused solely by his substance abuse or addiction.

Put simply, and in practical effect, in order to prevail on the defense of not guilty by reason of insanity here, defendant was required to prove by a preponderance of the evidence that he was incapable of knowing or understanding the nature and quality of his act and of distinguishing right from wrong at the time of the commission of the offense and that those incapacities were not caused solely by an addiction to or abuse of intoxicating substances.

Since the latter fact is essential to the defense defendant is asserting, defendant bears the burden of proof on this issue.

DISPOSITION

The judgment is affirmed.

_____HULL_____, J.

We concur:

_____RAYE_____, P. J.

_____HOCH_____, J.

14