Filed 3/27/24  P. v. Camper CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JERRY LOUIS CAMPER,<br><br>    Defendant and Appellant. | B325430<br><br>(Los Angeles County<br>Super. Ct. No. TA154235) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Nicholas J. Webster and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jerry Louis Camper (defendant) appeals from his second degree murder conviction. He contends the trial court abused its discretion in permitting the prosecution to elicit the underlying facts of a prior conviction, which was admitted pursuant to Evidence Code section 1103, subdivision (b).[1] Finding no abuse of discretion, we affirm the judgment.

## BACKGROUND

Defendant was charged with murder in violation of Penal Code section 187, subdivision (a), with the allegation that in the commission of the crime he personally used a firearm. The information further alleged defendant had previously been convicted of a serious or violent felony within the meaning of Penal Code sections 667, subdivisions (b)-(j), and 1170.12.

A jury convicted defendant of second degree murder and found true the allegation he personally used a firearm in the commission of the offense. After defendant waived a jury trial on the prior conviction allegation, the trial court found the allegation true, but struck it pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. On October 13, 2022, the trial court sentenced defendant to a term of 15 years to life in prison for the murder, with a consecutive term of 10 years for the firearm enhancement.

Defendant filed a timely notice of appeal from the judgment.

---

[1] All further unattributed code sections are to the Evidence Code unless otherwise stated.

**Prosecution evidence**

On April 10, 2021, police responded to a shooting report at Nickerson Gardens and found Delin Austin lying in an alcove between units, bleeding from a head wound. Austin sustained a total of six gunshot wounds including four fatal wounds to the head. Stippling found near Austin's eyes established the gun was less than three feet away from Austin's head when it was fired.

Four shell casings and video footage from multiple surveillance cameras located in the area were recovered at the scene. The surveillance video was shown to the jury and the action was described by Detective Manuel Armenta. The video recorded shortly after 10:00 p.m. showed Austin in the covered alcove in conversation with a man later identified as defendant. Austin's legs are seen hanging out of the alcove before he drops to the ground. Defendant takes two steps back, then two steps forward into the alcove, picks up something from the ground and walks away as Austin's body shakes violently before going limp. The recovered shell casings were found in or near the alcove.

Investigators obtained cellular subscriber information that showed defendant's cell phone was in the vicinity of the shooting when it occurred. The phone was located on a freeway shoulder near the City of Upland two days later.

**Defendant's testimony**

In his testimony defendant admitted he was the person in the video on April 10, 2021, who shot Austin in the alcove, but claimed he did not know how many shots were fired as he did not remember firing the gun or even the kind of gun. Defendant remembered, however, the events leading up to the shooting, except a fist fight with Austin that seems to be shown on the surveillance video. Defendant remembered he feared for his life.

Defendant also testified he had known Austin since they were teenagers, nearly 30 years, and they were good friends until 2018 when defendant's pit bull broke loose and attacked Austin. The dog pulled out some of Austin's hair and caused him to cut his arm, which required stitches. Defendant claimed Austin would often verbally and physically abuse the dog.

Thereafter Austin repeatedly brought up the 2018 incident and asked defendant to get rid of the dog. Defendant refused. Defendant described an occasion in March 2021 when Austin aggressively told defendant he would get rid of the dog if defendant did not, and if defendant had a problem with that Austin would get rid of defendant. Defendant interpreted this as Austin expressing a willingness to kill both defendant and the dog.

A few days later defendant was talking to mutual friends at a gas station, with his dog in the back seat, when Austin approached defendant's car. The dog barked "crazy" and tried to get to Austin through the window. Austin jumped back and said, "You better get that mother fucker before I shoot him." Defendant did not feel "directly" threatened at that time.

About 6:00 p.m. on the night of the shooting, defendant went to a friend's house to drink and smoke, unaccompanied by his dog. Austin was there with a few other friends. Austin seemed cordial and did not mention the dog. Defendant saw Austin approach the driver of a car that pulled up. He then saw Austin take a gun from the driver and put it in his car. The smoking and drinking continued until defendant left to attend a vigil for a deceased friend. Later, after Austin arrived at the vigil, the two men talked for some time without issues or problems, and even shared a drink from the same bottle.

About 10:00 p.m., when defendant attempted to retrieve his bottle, Austin's attitude changed. Austin told defendant to take the bottle, that he was "crying like a little bitch." Later, Austin made a comment about defendant's dog, and the two men argued. Austin became aggressive and hostile, saying, "I don't know who you think you are. You think you're tough. You know who I am." Austin told defendant he would "fuck" him up.

They were near the alcove around 10:00 p.m. when defendant heard Austin say, "I don't give a fuck. I do blood right now." Defendant thought this meant Austin intended to kill him. Defendant took two steps forward and got on the porch close enough to touch Austin in order to prevent him from taking defendant from behind. Defendant felt it was either fight or flee, and he was not going to expose his back. Defendant was concerned as there were gang members in the area, and both he and Austin were associated with the Bounty Hunter Blood gang. Defendant explained he feared for his life based on the arguments and Austin's comments about defendant's dog, and because he considered Austin a violent person, having seen him in the past beat up people. Though defendant had previously seen Austin with firearms multiple times, defendant testified he had no idea whether Austin had a gun in the alcove.

Defendant claimed not to remember firing the gun, shooting Austin or throwing away his phone. He said he "blanked out." Defendant acknowledged, however, the video showed Austin on the ground not presenting an actual threat at the time some of the shots could have been fired. Defendant further acknowledged the video showed him pick up something from the ground before walking away from Austin.

Defendant recounted events in his life that he thought could have affected his mental state. Specifically, he grew up in a household where his mother shot his father, who had abused both him and his mother, mentally and physically, and having seen gang violence, such as shootings, and beatings while living at Nickerson Gardens.

Defendant was arrested two days after the shooting in the City of Adelanto. Defendant claimed he left Los Angeles because he was afraid of retaliation after having been threatened by other gang members on social media. Defendant claimed no recollection of having thrown his cell phone away on the freeway after the shooting, though later in his testimony he acknowledged he had previously told police he had thrown the phone out the window. Defendant said he threw the gun away because he was angry that someone had shot up his grandmother's house after the shooting. Also, he received a threatening video from a fellow gang member, saying defendant had killed someone who was willing to do anything for "the set" and that Austin had previously murdered people.[2]

Clinical and forensic psychologist Dr. Rahn Minagawa testified that, based on defendant's description of his multiple exposures to trauma, defendant's exposure to trauma was quite severe, beginning in childhood and involving his family and the neighborhood where he grew up. In psychological testing, defendant scored high (90th percentile) for symptoms associated with posttraumatic stress disorder, indicating defendant's exposure to trauma was extreme.

---

[2] It does not appear the video was offered or entered into evidence.

Dr. Minagawa explained that exposure to violence and physical abuse can cause physiological changes in the brain, making the person hypervigilant and hypersensitive to threats in order to survive, much like soldiers who have served in combat. He explained automatic behavioral reactions can vary among such individuals who perceive themselves to be in a life threatening situation. Reactions may be quicker and may include, for example, freezing, fighting, or fleeing, depending upon a past exposure to multiple traumas over time. He added it is not uncommon for people who experience a traumatic event to be unable to recall certain aspects of the event. Although Dr. Minagawa thought defendant was being truthful and some of his test questions were designed to detect malingering, he could not rule out the possibility defendant was lying about how much he remembered of the shooting.

## DISCUSSION

Defendant contends the trial court abused its discretion in admitting evidence of his 2006 felony conviction without sanitizing it, that is, without naming the felony or revealing the underlying facts of the offense.

A trial court's "discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) It is the appellant's burden to demonstrate the trial court's decision was irrational, arbitrary, or not "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.'" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.)

7

When the prosecution rested its case, defense counsel requested a section 402 hearing regarding defendant's prior convictions the prosecution intended to use for impeachment should defendant testify. The prosecution identified defendant's 2015 felony conviction for violation of Vehicle Code section 10851 and his 2006 conviction for assault with a firearm pursuant to Penal Code section 245, subdivision (a)(2). A motion to exclude the 2006 conviction as remote was made by defendant. The trial court declined, noting defendant spent time in custody following a 2012 misdemeanor, between the two identified felonies. In 2009 defendant was convicted of possession of marijuana for sale (for which he served 44 months in prison), and for the 2015 Vehicle Code section 10851 conviction he served 32 months in prison.

Defense counsel then asked that the two felony convictions be sanitized and argued that otherwise the conviction of assault with a firearm would be more prejudicial then probative under section 352. The court ruled it would be sanitized for the time being, and the prosecution could request another section 402 hearing after defendant's testimony, when the court would better know the defense. On direct examination defendant admitted he had been convicted of a felony in 2006 and another in 2015.

After another section 402 hearing, the trial court ruled the prosecutor could ask defendant about the 2016 conviction, including the facts of the case, based upon section 1103, subdivision (b).[3] Section 1103, subdivision (b) provides that once

_____

[3] Section 1103, subdivision (b) reads: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not

8

defendant offers evidence to show that the victim was a violent person, thus "inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that . . . defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*People v. Fuiava* (2012) 53 Cal.4th 622, 696 (*Fuiava*).) The trial court noted defendant had attacked the character of the victim, testifying he had known the victim for many years, that the victim was a gang member, known to be violent, to fight, and to carry guns.[4]

In the ensuing cross-examination the prosecutor asked three questions, eliciting defendant's admission that in March

made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

Section 1101, subdivision (a), which provides that with exceptions "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[4]     The trial court also overruled defendant's objection based upon section 352, which provides, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

2005, he fired six bullets at Deshon Jones, one of which struck him in the thigh, for which defendant was convicted of a felony.

Defendant's claim is the trial court abused its discretion because his prior conviction was too remote for the underlying facts to have any probative value, as there were 16 years between the commission of the 2005 crime and the current crime with no evidence of an intervening violent crime.

In support of that argument, defendant quotes a passage in *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 447: "As Wigmore astutely observed, the time of character evidence '. . . as a question of Relevancy, is simple enough . . . . Character at an earlier or later *time* than that of the deed in question is relevant only on the assumption that it was substantially unchanged in the meantime, *i.e.* the offer is really of character at one period to prove character at another, and the real question is of relevancy of this evidence to prove character, not of the character to prove the act.'" Defendant then relies on *People v. Gonzales* (1967) 66 Cal.2d 482, a third party reputation case. There, the defense proffered the testimony of the former probation officer of an injured companion of the murder victim to the effect the companion had a reputation for violence seven years earlier. The court ruled the reputation of one *other than the murder victim* seven years earlier was too remote to have present probative value. (*Id.* at p. 500; accord, *People v. Minifie* (1996) 13 Cal.4th 1055, 1070 ["evidence of a third party's reputation for violence may be particularly susceptible to exclusion"]; see *Fuiava, supra*, 53 Cal.4th at p. 665.) Neither of these authorities supports defendant's arguments under the facts of this case.

The People rely on *People v. Steele* (2002) 27 Cal.4th 1230, 1245, in which the California Supreme Court acknowledged

10

evidence of other crimes is inherently prejudicial and held that when (as here) there is no rule or policy requiring exclusion of the evidence, exclusion due to remoteness is a matter of discretion, and the trial court should weigh its probative value against any prejudicial effect.  In *Steele*, the court found that, although 17 years had passed between a prior crime and the charged crime, exclusion was not compelled and prejudice was attenuated, given their similarities, the fact that defendant was convicted of the earlier crime, and considering defendant had little or no opportunity to commit a similar crime because he was incarcerated a substantial part of the intervening time.  (*Ibid*.) Here, similar factors demonstrate probative value and attenuated prejudice.  Defendant shot at the victims six times in both the 2005 assault with a firearm case and the current case, and he was convicted in the 2005 case and incarcerated for several years after that conviction.  Defendant served three prison terms after that: 44 months for a 2009 felony conviction, 180 days for the 2012 misdemeanor and 32 months for 2015 felony conviction. Thus during the 16 years between the crime in 2005 and the current crime, defendant was incarcerated about half that time, with less opportunity to commit a similar crime.  We thus reject defendant's claim of remoteness based on the 16-year period with no intervening violent crime.  We also reject defendant's claim the prior conviction was irrelevant or had no probative value.

Relevant evidence is to be excluded only when its probative value is *substantially* outweighed by the probability of *undue* prejudice.  (§ 352.)  Defendant argues the evidence here was unduly prejudicial due the similarity between his prior and current crimes.  We disagree, as this is one of the factors mentioned in *People v. Steele, supra*, 27 Cal.4th at page 1245, and

11

when considered with the other enumerated factors *reduces* the probability of prejudice.

Moreover, defendant's undue prejudice argument appears primarily to be that it was *unnecessary* to admit the evidence as impeachment under section 788 or section 1103, subdivision (b) without it being sanitized. Citing *People v. Beagle* (1972) 6 Cal.3d 441, 453, defendant argues that given the number of years with no intervening violent crime, the prior conviction should have been sanitized to prevent giving defendant a "false aura" of nonviolence. Rather, the California Supreme Court recommended courts sparingly admit identical prior crimes for impeachment, but cautioned that it did "not propose to encourage or countenance a form of blackmail by defendants. No witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity." (*Ibid*., abrogated on a different point in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

""'"[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.'"'" (*People v. Walker* (2006) 139 Cal.App.4th 782, 806.) In the context of section 352, evidence is not unduly prejudicial ""'"merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. . . . '[P]rejudicial' is not synonymous with 'damaging.'"'" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491, citations omitted.) Considering all the circumstances here, the evidence of defendant's prior conviction of assault with a firearm was prejudicial only in the sense it gave the jury an accurate view of the dynamics between Austin and defendant. Section 1103,

12

subdivision (b) very clearly allows evidence of defendant's prior conviction under the circumstances presented here.

We conclude the trial court carefully considered the circumstances and appropriately weighed the probative value of the evidence against its probable prejudice. Defendant has failed to meet his burden to demonstrate the trial court's decision was irrational, arbitrary, or not "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.'" (*People v. Superior Court* (*Alvarez*), *supra*, 14 Cal.4th at p. 977.)

Defendant has failed to show an abuse of discretion, and assuming he had, he has not demonstrated that admission of the evidence resulted in a "manifest miscarriage of justice." (*People v. Jordan, supra*, 42 Cal.3d at p. 316.) Defendant argues he has satisfied the test of *People v. Watson* (1956) 46 Cal.2d 818, 836, to demonstrate a reasonable probability that he would have obtained a better result absent the unsanitized evidence. Defendant asserts the prosecutor would not have been able to prove beyond a reasonable doubt that he did not act in self-defense or honestly believe in the need to do so, because the prosecutor would not have been able to tell the jury during closing argument that defendant had "shot at a person six times, and that person was hit in the thigh or the leg and had to go to the emergency room"; or remind the jury that "[t]he only person that has been proven with a conviction for shooting at someone is the defendant."

In addition, defendant recaps his testimony and the testimony of Dr. Minagawa suggesting that if a single juror had believed defendant's testimony and had given more weight to Dr. Minagawa's opinion, he would have achieved a better result.

13

In essence, defendant argues that if he had been accorded a "false aura" of nonviolence, a juror might have believed his testimony and that he had spoken truthfully to Dr. Minagawa.

Defendant was convicted of second degree implied malice murder. To do so the jury must find that defendant deliberately performed an act, the natural consequences of which were dangerous to life, that he knew his conduct endangered the life of an another and acted with conscious disregard for that life. (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

The jury here was instructed with the elements of implied malice and that the required mental state may be proven with circumstantial evidence, so long as the jury drew only reasonable inferences from the facts. "'It is settled that the necessary element of malice may be inferred from the circumstances of the homicide . . . .'" (*People v. Bloyd* (1987) 43 Cal.3d 333, 349.) Defendant claimed to have no memory of shooting Austin, fleeing the scene, or discarding his phone, because he "blanked out." Despite that, we find the circumstantial evidence of defendant's state of mind compelling.

The surveillance video shows that about 10:00 p.m. defendant and Austin engaged in a verbal and perhaps a physical altercation. Defendant remembered hearing Austin tell someone, "I don't give a fuck. I do blood right now," and that he feared for his life. Defendant remembered stepping into the alcove, although he claimed he did it as a defensive measure. The surveillance video shows defendant stepping into the alcove about 10:10 p.m., and then about one minute later Austin's legs are seen hanging out of the alcove and he drops to the ground. The video then shows defendant taking two steps back, then two steps forward into the alcove and picking up something before

14

walking away as Austin's body shook violently before going limp. The shell casings found at the scene were in or near the alcove.

Defendant shot Austin six times and several of the shots were fired while Austin was on the ground, presenting no threat to defendant. The medical examiner testified that Austin sustained four fatal wounds to the head from a gun that was less than three feet away from his body. Firing multiple gunshots at close range provides circumstantial evidence of an intent to kill (*People v. Lee* (2011) 51 Cal.4th 620, 637) or at least conscious disregard for human life (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1557-1558). Defendant then fled to another city, getting rid of evidence by throwing his phone to the side of a freeway. From these facts the jury could reasonably infer that defendant was conscious of his guilt. (See *People v. Scully* (2021) 11 Cal.5th 542, 596.)

Considering all these circumstances we discern no reasonable probability that defendant would have achieved a more favorable result if his prior conviction had been sanitized.

Defendant's final contention is that the admission of evidence of the facts underlying his conviction of assault with a firearm resulted in a miscarriage of justice so highly prejudicial that it rendered his trial fundamentally unfair, depriving him of due process. We need not address this contention as defendant has not demonstrated a miscarriage of justice. Defendant acknowledges this court is bound by the California Supreme Court holding in *Fuiava, supra*, 53 Cal.4th 622,[5] and has raised the issue solely to preserve it for review.

---

[5] The California Supreme Court held that the section 1101, subdivision (b) and section 1103, subdivision (b) are not

15

## DISPOSITION

The judgment is affirmed.

 

_____
        CHAVEZ, J.

We concur:


_____
ASHMANN-GERST, Acting P. J.


_____
HOFFSTADT, J.

---

fundamentally unfair, and the use of propensity evidence to prove a defendant's conduct after the defendant has elicited evidence of the victim's violent propensity does not offend the Constitution. (*Fuiava, supra*, 53 Cal.4th at pp. 696-700.) Defendant also acknowledges that United States Supreme Court has not decided whether the admission of propensity evidence violates due process or equal protection.